**HALLMARK DEVELOPERS, INC. and Charles Garrison; Plaintiffs**

v.

**FULTON COUNTY, GEORGIA,**
**Defendant**

**No. CIV.A.1:02–CV1862ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 12, 2005.

Kathryn M. Zickert, Linda Irene Dunlavy, Marcia M. Ernst, Smith Gambrell & Russell, Atlanta, GA, for Plaintiff's Attorney.

Larry Wayne Ramsey, Jr., Overtis Hicks Brantley, Steven E. Rosenberg, Val-

erie A. Ross, R. David Ware, Office of Fulton County Attorney, Atlanta, GA, for Defendants' Attorney.

## ORDER

EVANS, District Judge.

The above-styled action, having come on for trial without a jury on May 31, June 1, and June 2, 2005, and the Court having considered the testimony, exhibits, briefs and arguments of counsel hereby finds and concludes as follows:

### I. *Background and Procedural Posture*

This is a civil suit for declaratory and injunctive relief, as well as for compensatory damages, attorneys' fees and costs, brought pursuant to the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.* This action stems from the Defendant's denial of Plaintiffs' request to rezone approximately 182 acres of land located in the southwest quadrant of Fulton County ("Subject Property" or "Hallmark development").

On July 3, 2002, Plaintiffs filed the instant lawsuit, asserting that the denial of their proposed development on the Subject Property violates the Fair Housing Act, the Civil Rights Act, and the Fifth and Fourteenth Amendments to the U.S. Constitution and amounts to exclusionary zoning. Plaintiffs also alleged state law claims challenging the constitutionality of the existing zoning classification for the property. Two days later, on July 5, 2002, Plaintiffs filed an identical lawsuit in Fulton County Superior Court asserting the same state and federal law claims as in their federal suit. The state court action was stayed pending adjudication or dismissal of the previously filed federal suit.

Defendant filed a motion for summary judgment which was granted in part. Specifically, the Court granted summary judgment to Defendant on Plaintiffs' federal equal protection and exclusionary zoning claims; held that Plaintiffs' federal takings claim was not ripe and dismissed it without prejudice; and declined to exercise jurisdiction over Plaintiffs' state takings claim. With regard to the Fair Housing Act claim, the Court found that Plaintiffs did not present evidence of discriminatory motive or intent in the zoning decision but denied Defendant's motion in the face of Plaintiffs' evidence that the decision had a disparate impact on African–Americans. Only this latter claim remains for determination.

### II. *Findings of Fact*

The South Fulton County Planning Area is the part of Fulton County which is south of Camp Creek Parkway and Campbellton Road. (Tr. at 413). The South Fulton 2015 Land Use Plan adopted July 7, 1999, updated July 11, 2001, and amended August 7, 2002 covers this area. Pl.'s Ex. 17. The 2000 U.S. Census divided this area into eleven census tracts.[1] The overall population is more than 70% African–American, according to the 2000 Census data. However, four of the census tracts contain much lower percentages of black population, ranging from 31% to 54%. The property at issue in this case is in a tract with 54% black population; an adjoining tract to the east has 87% black population and the adjoining tract to the west is 42%

---

1. These census tracts are: 103.01, 103.04, 104, 105.07, 105.08, 105.09, 105.10, 105.11, 105.12, 105.13, 105.14.

black. South Fulton County, as defined, is sparsely populated when contrasted with nearby municipalities such as East Point, College Park, and Hapeville.[2] The contrast is even greater if the comparison is with the downtown Atlanta area.

While the South Fulton County Planning Area generally is less affluent than the rest of Fulton County, its black and minority population tends to be as affluent or more affluent than the white population. This is true for 10 of the 11 census tracts, including the one which encompasses the subject property.

The South Fulton 2015 Land Use Plan depicts a wide swath of land along both sides of the South Fulton Parkway which has been slated for mixed use development. It is denominated a Live/Work corridor. The idea is to integrate work places, shopping, entertainment, services, housing and community facilities in a pedestrian friendly environment. (Pl.'s Ex. 18 at 6.3). The uses contemplated for the Live/Work corridor include high density retail, service, office and institutional uses along with multi-family and single-family residential. (Pl.'s Ex. 18 at 6.3). The area currently is rural-residential in character. (Def.'s Ex. 3 at 3). The area is zoned agricultural and the minimum lot size is one acre. Land uses consist of detached single-family homes and vacant land. (Def.'s Ex. 3 at 3). The Subject Property is within the Live/Work corridor on the south side of South Fulton Parkway.

Plaintiffs Hallmark and Charles Garrison acquired the Subject Property via cash purchase (the portion along Koweta Road at $4,000 per acre in 2000, and the portion along Stonewall Tell at $9,500 per acre in 2001) with the express intention of developing a mixed use development, including commercial, office, and residential structures. (Tr. at 45–46, 50). The planned complex was to include 950 residential housing units, partly free-standing homes and partly townhomes/apartments. The development required that the land be rezoned.

Hallmark previously had developed more than 70 subdivisions in Gwinnett County, DeKalb County, Rockdale County, Coweta County, and Fulton County. (Tr. at 32). It has never forfeited a bond or been sued for defective work or development in any of its subdivisions. (Tr. at 39, 41). Its principal, Chris Doughtie, has won numerous awards including Gwinnett County Builder of the Year and several professionalism awards. (Tr. at 41). Since the 1990s, Hallmark has focused on building low-income housing and has been successful in this field. While Doughtie has also built "high end" homes through his other corporations, Hallmark made its reputation for building low-income residences.

At trial Doughtie explained that he considered the term "low income" to be the same as HUD's definition, which is up to 80% of HUD's Adjusted Median Family Income ("HAMFI")(Tr. 69). In 2001–2002, the HAMFI for a family of four in the Atlanta Metropolitan Statistical Area was $71,200.[3] The HAMFI is used by HUD to define eligibility for financial as-

---

**2.** The Court notes that East Point, College Park and Hapeville are located in the south part of Fulton County. They are not a part of the South Fulton 2015 Land Use Plan. The municipalities of Union City (approximate population 12,000) and Fairburn (approxi-

mate population 5500) are within the South Fulton 2015 Land Use Plan.

**3.** HUD's median income figures are not drawn from U.S. Census data and seem quite discrepant from median income estimates

sistance in obtaining a mortgage. Hallmark uses the availability of HUD assistance as a selling point for its homes.

As a precursor to seeking rezoning of the Subject Property, Doughtie arranged for Fulton County Commissioner Bill Edwards, Beth McMillan, Joseph Johnson[4] and their staffs to visit Chestnut Lake, a low-income, single-family subdivision that Hallmark had developed in Dekalb County. (Tr. at 54). Chestnut Lake contains 700 lots. The homes initially were priced in the range of $89,000 to $130,000, but after changes were made the price range was from about $120,000 to $150,000. (Tr. at 43, 55). The majority of the homes had been built by Mayfield Homes, which is owned in part by Doughtie and his son, Sean. (Tr. at 40, 43, 57). During the visit, Doughtie told Edwards and the other County representatives that Mayfield Homes would construct the free-standing homes planned for the Subject Property (Tr. at 111–112) and that these homes would be similar in appearance and layout to those at Chestnut Lake. Photographs of some of the Chestnut Lake homes were introduced into evidence at trial. Doughtie testified that Commissioner Edwards and others in the group expressed general approval of what they saw at Chestnut Lake and that they were receptive to Plaintiffs' plans to emulate it on the Subject Property. (Tr. at 52). Nevertheless,

Commissioner Edwards did have some reservations and he also believed that there would be some community opposition to the project.

At trial, Commissioner Edwards testified that his concern with Plaintiffs' proposed development was "quality." (Tr. at 454). He elaborated as follows:

> The quality—South Fulton County—this is one of the first zonings we had in South Fulton County. It was around the time when people were really taking a great look at our part of the county. And one of the concerns that—not only that we had, but the community has is the issue of quality, the materials that were used in the house, does it give a community feel, are we using the amenities to give additional quality to the home, those types of things.

> \*   \*   \*   \*   \*   \*

> Then you had no ornamental railings .... You had the little wooden porch type deal, one car garage. There was— I didn't hardly see any molding of any type inside the construction. So it was just a very generic type structure.

> \*   \*   \*   \*   \*   \*

> The rooms were real small ... really small rooms and kitchen area.

> \*   \*   \*   \*   \*   \*

prepared by the U.S. Census Bureau. 2000 U.S. Census data shows that Cobb County had the highest median household income of all Georgia counties ($56,328); Gwinnett County was next ($56,285); then DeKalb County ($48,464) and then Fulton County ($44,017). It would be impossible, therefore, for the median household income for the twenty-county Atlanta MSA to be $71,200 per the 2000 Census. U.S. Census Bureau, "Median Household Income (In 2000 Inflation-adjusted Dollars) (County Level);" at http:www w.census.gov/acs/www/Products/Rank-

ing/2000/R07T050.htm; (last visited Sept. 7, 2005).

4. Beth McMillan is the Fulton County Assistant Director of Comprehensive Planning. Joseph Johnson is the Fulton County Economic Development Director. Edwards and McMillan are African–American. Johnson is white. Commissioner Edwards resides in South Fulton County not far from the Subject Property in a mixed-use development.

When you looked down the street, you [sic] looking for a wholesome feel for the community. I didn't feel that because all of the houses was of the same elevation, and they just looked like row houses.

(Tr. at 455–458).

Commissioner Edwards encouraged Plaintiffs to work with the community groups to see if they could devise a compromise project that would be acceptable to both. (Tr. at 467). Among the community groups with whom Plaintiffs conferred were the South Fulton Parkway Alliance, the Cliftondale Community Association, and Green South Fulton. (Tr. at 470).

There was community opposition to the rezoning application. The trial record contains the comments community group members made at the rezoning hearings. They objected to the density of the project, the number of apartment units in particular, the lack of two car garages, the smallness of the lot sizes (4,000 to 6,000 square feet), and the fact that the project was focused on lower priced homes and apartments. Plaintiffs' contention that the community groups were motivated by anti-black sentiment was not borne out by any trial evidence.

In October 2001 Plaintiffs filed an application with the Fulton County Department of Environment and Community Development seeking to rezone the Subject Property from AG–1 (agricultural) zoning classification to MIX (Mixed Use District). (Pl.'s Ex. 1). Plaintiffs' Application described 76,000 square feet of retail/office space; a 450 unit apartment complex; 125 townhomes (1,100 square feet minimum); and three pods with free standing single family houses: Pod A contained 90 minimum 1,400–square foot homes; Pod B contained 185 minimum 1,200–square foot homes; Pod C contained 111 minimum 1,000–square foot homes. (Pl.'s Ex. 1).

Hallmark's announced intention was to sell homes in the following price ranges:

- 40 foot lots (Pod C): $100,000 to $120,000 homes;
- 50 foot lots (Pod B): $120,000 to $140,000 homes;
- 60 foot lots (Pod A): $140,000 to $180,000 homes;

(Tr. at 61). Doughtie intended to price the townhomes between $70,000 to $90,000. (Tr. at 61). Apartment rents would range from $600 to $900, with 80 percent of the apartment units in the $600 to $750 range. (Tr. at 68). Of the 961 total housing units in the proposed development, Doughtie testified that 700 to 725 were to be "low income" housing units, with "low income" defined as being affordable to those earning 80 percent of the median family income for a family of four. (Tr. at 69).

Hallmark did make extensive efforts to compromise with the community. For example, Doughtie agreed to use at least four different elevations[5], and twelve different floor plans in each pod of the free-standing home component. (Tr. at 76, 475). Staggered setbacks would be used. The unit sizes would be increased. He committed to use hardiplank[6] siding rather than vinyl siding as at Chestnut Lake[7]

---

5. The Court assumes this means the appearance of a vertical plane of the structure, probably the front of the house.

6. Evidently a cement-based product.

7. "Siding" does not necessarily mean the overall exterior finish. The Chestnut Lake homes had partly brick exteriors.

and to use brick on the apartment facades. (Tr. at 471, 477). The number of apartments would be reduced from 450 to 350 and the number of 3 and 4 bedroom apartments was reduced. Hallmark also committed to a village design around green space on the apartment part of the community and added an amenity package. (Tr. at 473). Pedestrian walks and pocket parks were added. (Tr. at 476). The number of cul-de-sacs was decreased and the streets were interconnected. Plaintiffs revised their original site plan a total of three times—on January 18, 2002, May 6, 2002, and June 3, 2002. (Pl.'s Ex. 7, 11, and 12). In the course of a year or a year and a half, Doughtie met with Edwards and/or community groups at least ten times, but he was only able to obtain the support of the South Fulton Parkway Alliance. (Tr. at 84).

In an effort to rebut Commissioner Edwards' stated concerns about quality, Hallmark introduced evidence at trial to show that its "low income" houses are built using high quality construction standards. Hallmark put forward evidence concerning the quality of the concrete, electrical wiring, plumbing (copper pipes), heat and air systems, and spacing of the studs (16 inches apart). This evidence did show that the construction standards met or exceeded code requirements. The Court accepts Hallmark's assertion that these elements are the same quality as those Doughtie uses in "high end" construction. It does not seem, however, that Commissioner Edwards' reference to lack of "quality" was meant to suggest lack of quality in construction techniques or standards. Rather, he was reacting to Chestnut Lake's overall look of homogeneity as reflected in the facades of the homes, their uniform setback from the street, the smaller sizes of the homes and the smaller room sizes.[8] In short, the Court believes that the community groups wanted a more "upscale" development which would include larger (and fewer) homes, larger lots and more varied architecture.[9] The Court does believe that Commissioner Edwards was heavily influenced by the staunch opposition of two of these community groups.

Plaintiffs' Application was reviewed and repeatedly recommended for conditional approval by Defendant's planning staff, other agencies in Fulton County, its Community Zoning Board, the Atlanta Regional Commission ("ARC"), and the Georgia Regional Transportation Authority ("GRTA"). (Pl.'s Ex. 5, 6, 8, 10, 13). Hallmark was amenable to the conditions of these approvals, and specifically agreed to an extensive list proposed by the county planning staff. (Pl.'s Ex. 14).

Plaintiffs appeared before the Board of Commissioners at a public hearing on February 6, 2002. The Board granted a 60–day deferral for Plaintiffs to continue discussions with the community affected by the proposed development. (Def.'s Ex. 4 at 107–08). On April 3 Plaintiffs appeared before the Board for a second time. Commissioner Edwards, who is commissioner of District 7 where the Subject Property is located, moved to deny Plaintiffs' applica-

---

8. The Court notes that the photographs of the exterior of individual Chestnut Lake homes do depict attractive, trim looking residences. They are not what the average person would think of as a "low income" home.

9. Naturally, if construction quality is kept constant, increasing the size of a home and adding unique features will considerably affect the cost of construction. Doughtie testified that the agreed-upon changes would have had this effect. No evidence was introduced at trial to quantify these price increases.

tion "based on the quality of what [he'd] seen and things [he'd] heard." (Def.'s Ex. 5 at 62). Chairman Mike Kenn supported Commissioner Edwards' motion, stating that the development was "probably one of the poorest-designed, laid-out subdivisions [he'd] ever seen." (Def.'s Ex. 5 at 62–63). Another Commissioner made a substitute motion for an additional 60–day deferral, which was granted so that the applicant and the opposition could continue to discuss unresolved issues. (Def.'s Ex. 5 at 72–73). On or about June 5, 2002, Plaintiffs appeared before the Board for a third and final time. Following the public hearing, Commissioner Edwards again moved to deny Plaintiffs' application due to the lack of improvement "in terms of the quality of the site plan and the site plan design." (Def.'s Ex. 6 at 45). Plaintiffs' rezoning application was subsequently denied by the full Board. (Def.'s Ex. 6 at 45–46).

Dr. Calvin Bradford, Plaintiffs' expert,[10] concluded in his Disparate Impact Report that "the elimination of either for sale or rental housing in the lower cost ranges of the proposal for the Hallmark development would disproportionately and adversely affect minority households as compared to white households." (Pl.'s Ex. 80 at 6).

Dr. Bradford calculated disparity ratios based on an assumption that persons who owned homes or rented apartments in certain "value ranges" in certain geographical areas were representative of those who would have bought or rented similarly priced units in the Hallmark development, had it been built. He used 2000 U.S. Census data, which included data as to the race of each homeowner/renter, that individual's estimate of the value of his home or the amount of monthly rent, and the address of the residence.

Dr. Bradford examined data from five geographical areas: (1) the area within a 10–mile radius of the proposed Hallmark development, (2) again for a 20–mile radius, and (3) for a 30–mile radius. (Pl.'s Ex. 80 at 11). He also included two more regional areas: (4) a 30–mile radius from the State Capitol Building in central Atlanta, and (5) the 20 counties constituting the Atlanta Metropolitan Statistical Area, as defined by the Federal Office of Management and Budget. (Pl.'s Ex. 80 at 11). Dr. Bradford opined that the two metropolitan regional market areas would be the most reliable indicators of the race of likely owners/renters for the Hallmark development. (Pl.'s Ex. 80 at 11). His reasoning was that the size of the Hallmark development suggested it would draw from a larger area.[11]

Bradford's disparity impact ratios are summarized below:

*Home Value Disparity Ratios*

|  | $90,000–$99,999 | $100,000–$124,999 | $125,000–$149,999 | $150,000–$174,999 | $175,000–$199,999 |
|---|---|---|---|---|---|
| 10–mile radius | 1.40 | 1.19 | 0.76 | 0.63 | 0.55 |
| 20–mile radius | 1.43 | 1.16 | 0.94 | 0.74 | 0.50 |

**10.** Dr. Bradford is a nationally recognized expert in the area of fair housing, with substantial education, qualifications, training and experience in the areas of statistical disparate impact analysis and the calculation of disparate impact ratios.

**11.** The Court does not find this reasoning compelling. A twenty mile radius around the Subject Property would represent an area of 1,256 square miles, an ample area.

| | | | | | |
|---|---|---|---|---|---|
| 30–mile radius | 1.66 | 1.35 | 0.98 | 0.76 | 0.51 |
| 30–mile radius (State Capitol) | 1.71 | 1.27 | 0.96 | 0.79 | 0.54 |
| Atlanta MSA | 1.61 | 1.22 | 0.94 | 0.79 | 0.55 |

*Gross Rent Disparity Ratios*

| | $600–$649 | $650–$699 | $700–$749 | $750–$799 | $800–$899 | $900–$999 |
|---|---|---|---|---|---|---|
| 10–mile radius | 1.20 | 1.66 | 1.24 | 0.89 | 1.01 | 0.69 |
| 20–mile radius | 1.62 | 1.51 | 1.08 | 0.92 | 0.69 | 0.55 |
| 30–mile radius | 1.61 | 1.56 | 1.20 | 1.08 | 0.88 | 0.71 |
| 30–mile radius (State Capitol) | 1.68 | 1.53 | 1.21 | 1.05 | 0.87 | 0.70 |
| Atlanta MSA | 1.52 | 1.46 | 1.21 | 1.06 | 0.90 | 0.74 |

(Pl.'s Ex. 80 at Attachments I, J, L, and M).

A disparity ratio greater than 1.0 on the chart means that the elimination of homes or apartments in that range would impact African–Americans more than whites. (Pl.'s Ex. 80 at 7–8). For example, a disparity ratio of 1.5 would mean that blacks would be 1.5 times more likely to be affected by the elimination of housing units for that value range. Dr. Bradford concluded that there would be a statistically significant disparate racial impact arising from the elimination of Hallmark's homes priced below $125,000 and Hallmark's rental housing costing less than $750 a month.[12] Those were the individuals who he believed would have been prospective buyers/renters in the Hallmark development, but who were deprived of that opportunity because the rezoning failed and the development could not go forward.

Plaintiffs introduced into evidence a housing study, entitled Housing Conditions and Homeless and Special Needs Assessments and Housing Market Analysis. Pl.'s Ex. 36. It concluded that there was a lack of affordable housing in Fulton County (excluding the City of Atlanta), including South Fulton County. This meant that households had to devote more than 30% of their household income to housing expenses. This study was published in 2001 and was based on 1990 U.S. Census data. Defendants point out, correctly, that this data is too old to be helpful.

Defendant does not dispute Dr. Bradford's disparity ratio calculations per se. Rather, Defendant argues that the ratios are too insignificant to establish a prima facie case under the Fair Housing Act. Further, Defendant offered the testimony of expert witness Gary Hammond[13] who testified that any disparity ratio should be discounted because there is an oversupply of housing, particularly apartments, available to persons in South Fulton County,

12. Dr. Bradford found that no discriminatory effect to blacks was shown by the non-availability of Hallmark homes priced at $125,000 and above and rentals at $750 and above.

13. Gary Hammond has been actively involved in appraisal and consulting full time since 1990 and is the sole shareholder of G. Randall Hammond & Co., which specializes in appraisal, brokerage, and consulting activities. Mr. Hammond is also the sole shareholder of a real estate development company, Hammond Development, Inc., which is actively engaged in development of affordable rental communities around the Atlanta MSA and Georgia. Mr. Hammond's professional specialties are (1) low-income housing tax credit multi-family property consulting; (2) affordable and market-rate multi-family property appraisal and consulting; (3) multi-tenant investment property (hotel, office, retail)

including African–Americans. Hammond's study was done in 2004 and was based on information from 2002–2003.

Hammond defined South Fulton County as the fifteen census tracts generally outside of Interstate 285, the City of Atlanta, and the neighboring counties of Cobb, Carroll, Clayton, Coweta, Douglas, and Fayette.[14] (Def.'s Ex. 3 at 11). Finding that the "submarket is at a serious risk of overbuilding," Hammond concluded that the "[d]enial of the Hallmark/Garrison project will have no impact on the future availability of affordable[15] housing at this time." (Def.'s Ex. 3 at 9).Specifically, with regard to for-sale and rental housing, Hammond concluded as follows:

> The South Fulton County submarket has heated up over the last few years and developers have rushed in to rezone land, obtain LDPs [land disturbance permits], and deliver product. Overwhelmingly, the pipeline consists of housing within the defined affordable range. Presently, the submarket has an adequate supply of finished new homes but an oversupply of VDLs [vacant developed lots]. Considering the potential pipeline, the submarket is at a serious risk of overbuilding.

> \*    \*    \*    \*    \*    \*

> Atlanta's and South Fulton's apartment market is presently overbuilt. There

are adequate rental housing opportunities available in decent, safe and sanitary units. Denial of the Hallmark/Garrison project will have no impact on the future availability of affordable rental housing at this time.

(Def.'s Ex. 3 at 9–10).

Plaintiffs make several responses to Hammond's opinions. First, they argue that Hammond lacks the credentials to offer any opinion about disparate impact ratios. Second, they point out that some of Hammond's data is pertinent to a time frame *after* the denial of the rezoning application, when building activity in South Fulton County increased considerably. Third, they liken Hammond's argument that the availability of other housing should be considered in determining discriminatory impact to justifying the maintenance of a "white only" lunch counter by reference to the availability of a nearby desegregated lunch counter.

While it is true that Hammond is not an expert on disparate impact theory, the important part of his testimony does not require such expertise. The thrust of his testimony is that the availability of a substantial supply of other accessible housing is relevant when considering the degree of disparate impact stemming from the withdrawal of the Hallmark development from the market. The Court agrees with this

---

appraisal and consulting; and (4) eminent domain appraisal.

**14.** Hammond's definition does not exactly match the area shown on the 2015 South Fulton County Land Use Plan. He added four census tracts to those depicted on the South Fulton Planning Area map—census tracts 77.02, 78.02, 78.05 and 103.03. These are less populated, less developed areas on the northwest side of the Planning Area. Hammond also excluded census tracts 113.04, 106.03 and 106.04 which are on the east side

of the Planning Area. These tracts are within municipalities. The net effect of these changes was to focus on less populated areas of South Fulton County.

**15.** Hammond defined an "affordable" home for a one- to five-person "very low" income family as one ranging in price from $98,000 to $151,100, which translates into an annual household income range of $30,000 to $50,000. Def.'s Ex. 3 at 11.

point of view. Regarding the "lunch counter" comparison, the Court would agree with Plaintiffs if this case involved intentional discrimination; however, it does not. The issue here is disparate impact. In measuring disparate impact, context is important. Put another way, where the market includes available housing beyond that represented by Plaintiff's own project, the appropriate comparison is between what is available in the market as a whole both with and without Plaintiff's project. The effect of withdrawal of Plaintiff's project— indeed, here only a portion of Plaintiff's project—only on those who would have occupied that project—is simply not apt.

Plaintiffs are correct that Hammond's data concerning increased construction activity in South Fulton County concerns, in part, a period of time post-dating the denial of the rezoning application. However, the record contains other evidence that the increased level of construction activity began in 2001–2002. Dr. Camilla Johnson Moore, Director of the Fulton County Office of Housing, testified that in 2002, when the Hallmark rezoning application was denied, there was adequate housing in South Fulton County for low and moderate income residents. In fact, she said there was "an over saturation." Tr. 404. Moore also testified that, while her office has oversight responsibility for fair housing issues in Fulton County (excluding the area within the City of Atlanta), to her knowledge there have been no fair housing issues in South Fulton County. The Court

credits Moore's testimony. Coupling Moore's testimony with the fact that South Fulton County is overwhelmingly populated by African–Americans, the Court finds that in 2002, there were no significant barriers [16] to entry into the housing market for African–Americans in South Fulton County, including those in low and moderate income groups. The evidence leaves the Court with confidence that had the Hallmark development been constructed, there would have been numerous other developments competing with Hallmark for the business of area residents, including African–Americans. Put another way, the absence of the Hallmark development had no appreciable impact on the availability of low and moderate income housing for those desiring such housing in South Fulton County, including African–Americans.

The Court finds that Dr. Bradford's disparity ratios—ranging from 1.16 to 1.66 for the relevant value ranges and areas are unimpressive, even if they are taken at face value. A disparity ratio of 1.3, for example, only means that a minority group would be slightly more likely to be adversely affected. Moreover, disparity ratios can be confusing. It is more useful to compare directly the market proportions of white and black households living in a given area and value range *without* dividing these percentages and deriving a disparity ratio. Using Dr. Bradford's data, these percentages would be as follows:

Percentages of Whites and Blacks
Representative of Potential Home Buyers
in the Hallmark Development

| Value Ranges | | $90,000–$99,999 | $100,000–$124,999 |
| --- | --- | --- | --- |
| 10–mile radius | % white owners | 10.19 | 14.61 |
| | % black owners | 14.27 | 17.39 |

16. The Court does not draw from Moore's testimony the finding that there have never been any fair housing problems in South Fulton County.

| 20–mile radius | % white owners | 9.12 | 14.66 |
|---|---|---|---|
| | % black owners | 13.04 | 17.06 |

(Pl.'s Ex. 80 at attachments I, J).

Percentages of Whites and Blacks
Representative of Potential Renters
in the Hallmark Development

| Value Ranges | | $600–$649 | $650–$699 | $700–$749 |
|---|---|---|---|---|
| 10–mile radius | % white renters | 9.50 | 7.27 | 8.17 |
| | % black renters | 11.42 | 12.07 | 10.12 |
| 20–mile radius | % white renters | 5.74 | 6.43 | 7.66 |
| | % black renters | 9.30 | 9.73 | 8.30 |

(Pl.'s Ex. 80 at attachments L, M).

When the data is viewed this way, it can be seen that the difference in representation between black homeowners/renters versus white homeowners/renters does not exceed 4.8% in any category.

In addition, while the Court does not doubt the mathematical accuracy of Dr. Bradford's calculations, his results are inherently speculative for at least two reasons. First, the calculations necessarily relate not to a known group of individuals, but rather to an *estimated*, hypothetical group. Secondly, while the "value ranges" used do include Hallmark's initially announced prices, it appears that had the project been built the unit prices would have been much higher. It is not at all clear that there would have been any freestanding houses in the $100,000 to $120,000 range, for example. The Chestnut Lake homes which were the prototype for the houses in the Hallmark development, and which were built in 2001 or before, wound up selling for $120,000 to $150,000. The ultimate rental cost for the apartments is even more speculative. Doughtie testified that the apartment portion of the project would be sold and that he planned to arrange a contract for this purpose with a premier apartment builder/manager. It is impossible to know whether such an arrangement, if made, would have resulted in any rentals in the range of $600–$749 per month. If it did not, the disparity ratios calculated by Dr. Bradford would be inapplicable. The uncertainty as to who would have bought or rented and as to the sale/rental prices further undermines confidence in the already small disparity ratios calculated by Dr. Bradford.

At trial, Plaintiffs presented unrebutted evidence that by virtue of delaying the approval of its project from June 2002 to date, they face a considerable increase in development-related expenses: approximately $600,000 in increased permit fees charged by Fulton County, and slightly in excess of $650,000 in water tap fees charged by the City of Atlanta. (Tr. at 85). Approximately $1,250,000 would be paid by Plaintiffs at the present time, over and above what they would have paid during the development process in 2002 and 2003, to develop this project. Combined with the "time value" of money invested in the property and working capital expenses incurred, Plaintiffs seek a total of $1,700,000. (Tr. at 87).

III. *Conclusions of Law*

Plaintiffs' claim under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, enacted as

Title VIII of the Civil Rights Act of 1968, is premised on the alleged racially discriminatory impact of Defendant Fulton County's denial of Plaintiffs' re-zoning application for the Subject Property. Title VIII forbids, in pertinent part, any effort

> (a) to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or to otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a).

■ As a preliminary matter, the Court addresses Defendant's renewed argument that Plaintiffs do not have standing to bring this action. The Court rejected this argument earlier and does so again. By the express terms of the Fair Housing Act, any person or entity "aggrieved" by an allegedly unlawful practice is authorized to bring suit. 42 U.S.C.A. § 3610(a)(1)(A). The definition of "aggrieved person" includes anyone who "claims to have been injured by a discriminatory housing practice." 42 U.S.C.A. § 3602(i)(1). Under long-established precedent, standing under the Fair Housing Act is not limited by prudential concerns but is satisfied by the minimum constitutional "case or controversy" requirement of Article III. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). This means that Plaintiffs need only show (1) an actual or threatened injury; (2) that is caused by or fairly can be traced to the defendant's challenged action; and (3) that is likely to be redressed by a favorable court decision. *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1537 (11th Cir.1994). Plaintiffs meet the minimum standing requirements of Article III.

■ The Court now considers the merits of Plaintiffs' Fair Housing Act claim. In *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), the Supreme Court held that Title VIII should be broadly interpreted to fulfill the Act's Congressional mandate. *Trafficante*, 409 U.S. at 212, 93 S.Ct. 364 (Fair Housing Act must be generously construed to foster integration). Various courts, including the Eleventh Circuit, have concluded that proof of discriminatory purpose is not necessary to establish a Title VIII violation; rather, the plaintiff need only prove that the challenged action had a discriminatory effect to establish a prima facie violation of Title VIII. *See Jackson v. Okaloosa County*, 21 F.3d 1531, 1543 (11th Cir.1994), citing *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir.1978); *United States v. Housing Authority of City of Chickasaw*, 504 F.Supp. 716, 727 (N.D.Ala.1980); *Metropolitan Housing Development v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir.1977); *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir.1977), cert. denied 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir.1974), cert. denied 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Huntington Branch, National Association for the Advancement of Colored People v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir.1988).

■ Once a prima facie case has been established, the burden falls to Defendant to prove that its decision was based on a legitimate governmental reason. Once a prima facie case has been established, the

burden shifts to Defendant to show that its decision was based on a legitimate, bona fide reason and there was no less discriminatory alternative available. *Fair Housing in Huntington Committee, Inc. v. Town of Huntington, New York*, 316 F.3d 357, 366 (2d Cir.2003); *Resident Advisory Board*, 564 F.2d at 149. If Defendant cannot rebut the prima facie case, a violation is established. *Id.* at 149.

■ The evidence of disparate impact in this case is insufficient to establish a prima facie case. No significant impact has been shown. The facts of this case are far different from other cases where courts have found a disparate impact which creates a prima facie case. For example, in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court found discriminatory an employer's policy of hiring only high school graduates where 12% of black males in North Carolina had high school diplomas while 34% of white males were high school graduates.

The United States Court of Appeals for the Eleventh Circuit found a disparate impact in *Jackson v. Okaloosa County, Florida*, 21 F.3d 1531 (11th Cir.1994). In that case, a project housing applicant and resident sued the county for alleged violations of the Fair Housing Act in its site selection process for a new public housing project. The Eleventh Circuit first noted that "a showing of a *significant* discriminatory effect suffices to demonstrate a violation of the Fair Housing Act." *Id.* at 1543 (emphasis added) (citing *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir.1978)). The court then noted that the "exclusion of public housing from the unincorporated five-mile area allegedly had a harsher impact on African–Americans than whites because 86% of the persons on the wait-list

for public housing are African–American, and the neighborhood where the new public housing project will probably be built (absent court action) is racially impacted." *Id.*

In *Huntington Branch, National Association For the Advancement of Colored People v. Town of Huntington*, 844 F.2d 926 (2d Cir.1988), the town of Huntington restricted private construction of multi-family housing to a narrow urban renewal area. Plaintiffs filed suit when the Town refused to rezone property outside this urban renewal area for the construction of an integrated multi-family subsidized apartment complex. In finding disproportionate harm to blacks creating a "strong prima facie showing of discriminatory effect," the Second Circuit noted that 7% of all Huntington families needed subsidized housing in 1982–1985, while 24% of the black families needed such housing. *Huntington*, 844 F.2d at 938. In addition, "minorities constitute a far greater percentage of those currently occupying subsidized rental projects compared to the town's population." *Id.* Similarly, the Second Circuit found, "a disproportionately high percentage (60%) of families holding Section 8 certificates from the Housing Authority to supplement their rents are minorities, and an equally disproportionate percentage (61%) of those on the waiting list for such certificates are minorities." *Id.*

In another case, *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 988 (4th Cir. 1984), the Fourth Circuit found that the apartment complex's new adults-only rental policy had a "substantially greater adverse impact on minority tenants." In arriving at this conclusion, the Fourth Circuit noted that of the total number of people living in the building where the

new policy was in force, 74.9 percent of the non-whites were given eviction notices while only 26.4 percent of the whites received such notices. *Id.* Under these circumstances, the Fourth Circuit found that "disparate impact is self-evident." *Id.*

Finally, and alternatively, the Court concludes that Plaintiffs' disparate impact methodology is faulty for failing to take into account the significant availability of other housing choices in South Fulton County.

The Court concludes that Plaintiffs have failed to establish a prima facie case. Therefore, it is unnecessary to examine the legitimacy of Defendant's stated reason for denying the rezoning application. The Court is unaware of any decision where a prima facie violation of the Fair Housing Act was established based on a disparity of such small magnitude.

Of course there are two kinds of racially discriminatory effect which can be produced by a facially neutral decision. If the decision or action perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups. *See Trafficante*, 409 U.S. at 209–210, 93 S.Ct. 364. In *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975) and *Kennedy Park Homes Assoc., Inc. v. City of Lackawanna*, 436 F.2d 108 (2d Cir.1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971), local zoning ordinances prevented the construction of low-income housing which would have affected whites along with minorities. In both cases, however the court nonetheless found a racially discriminatory effect. What was present in *Black Jack* and *Kennedy Park* was a strong argument supporting discriminatory impact in the second sense. In each case, the municipality or section of the municipality in which the proposed project was to be built was overwhelmingly white.[17] Moreover, in each case construction of low-cost housing was effectively precluded throughout the municipality or section of the municipality which was rigidly segregated. Thus, the effect of the municipal action in both cases was to foreclose the possibility of ending racial segregation in housing within those municipalities.

In this case, Fulton County's denial of Plaintiffs' rezoning application had no such segregative effect. In the absence of the Hallmark development the South Fulton County area likely will remain a racially mixed, predominantly African–American area, just as it was previously.

### IV. *Conclusion*

In sum, the Court concludes that Plaintiffs' showing of discriminatory impact is too weak to establish a prima facie case under the Fair Housing Act. There is no evidence that Defendant's action in denying Plaintiffs' rezoning application had the effect of perpetuating segregation. There is no evidence of discriminatory intent on Defendant's part. Therefore, the Court directs that judgment be entered in favor of Defendant, with costs on the Plaintiffs.

---

17. The area of St. Louis County which included the City of Black Jack was approximately ninety-nine percent white. *Black Jack*, 508 F.2d at 1183. The "Third Ward" of the City of Lackawanna, where the proposed project was to be built, had 12,229 residents, of whom only twenty-nine were black. *Lackawanna*, 436 F.2d at 110.