**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| AVENUE 6E INVESTMENTS, LLC, an Arizona limited liability company; SAGUARO DESERT LAND, INC., an Arizona corporation, *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY OF YUMA, Arizona, a municipal corporation, *Defendant-Appellee*. | No. 13-16159 <br><br> D.C. No. 2:09-cv-00297-JWS <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
John W. Sedwick, District Judge, Presiding

Argued and Submitted
August 13, 2015—San Francisco, California

Filed March 25, 2016

Before: Stephen Reinhardt, A. Wallace Tashima,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Reinhardt

# SUMMARY[*]

## Civil Rights

The panel reversed the district court's dismissal of a complaint for failure to state a claim, reversed the district court's summary judgment in favor of defendant, and remanded in an action brought by two real estate developers who asserted that the City of Yuma's refusal to rezone land to permit higher-density development violated, among other things, the Equal Protection Clause and the federal Fair Housing Act.

Plaintiffs asserted that the City's refusal stemmed from intentional discrimination against Hispanics and created a disparate impact because the denial disproportionately deprived Hispanic residents of housing opportunities and perpetuated segregation.

Taking the factual allegations in the complaint as true, the panel first held that plaintiffs presented plausible claims for relief for disparate treatment under the Fair Housing Act and under the Equal Protection Clause. The panel noted that the City Council denied plaintiffs' request for rezoning despite the advice of its own experts to the contrary and in the context of what a reasonable jury could interpret as racially charged opposition by Yuma residents. Given these circumstances, the panel determined that the complaint passed the plausibility bar. The panel remanded to the district court on these claims.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel reversed the district court's grant of summary judgment in favor of the City on plaintiffs' disparate-impact claim and vacated the district court's denial of the City's second summary judgment motion as moot. The panel rejected the district court's view that other similarly-priced and similarly-modelled housing available elsewhere necessarily precluded a finding that there was a disparate impact. The panel remanded for the district court to address the City's second motion for summary judgment in the first instance.

## COUNSEL

Elizabeth Brancart (argued) and Christopher Brancart, Brancart & Brancart, Pescadero, California, for Plaintiffs-Appellants.

Andrew M. Jacobs (argued), Snell & Wilmer L.L.P., Tucson, Arizona; Vaughn A. Crawford, Martha E. Gibbs, and Benjamin M. Mitsuda, Snell & Wilmer L.L.P., Phoenix, Arizona, for Defendant-Appellee.

## OPINION

REINHARDT, Circuit Judge:

The Fair Housing Act (FHA) is one of the most important pieces of legislation to be enacted by the Congress in the past 60 years. It strikes at the heart of the persistent racism that so deeply troubles our Nation. Here, we deal with one aspect of that law: zoning or rezoning of land as it affects the

construction of housing that may be affordable by significant numbers of members of minority groups.

Plaintiffs, two real estate developers ("Developers"), bring this case against the City of Yuma, contending that the City's refusal to rezone land to permit higher-density development violated, among other things, the Equal Protection Clause of the United States Constitution and the federal Fair Housing Act (FHA). In particular, Developers maintain that the City's refusal stemmed from intentional discrimination against Hispanics and created a disparate impact because the denial disproportionately deprives Hispanic residents of housing opportunities and perpetuates segregation. The district court first dismissed Developers' Equal Protection and FHA disparate-treatment claims under Rule 12(b)(6) for failure to state a claim and denied Developers' motion for leave to file a Second Amended Complaint. It then granted summary judgment in favor of the City on Developers' disparate-impact claim, rejecting both theories on which Developers relied.

Taking the factual allegations in the complaint as true, we first hold that Developers presented plausible claims for relief for disparate treatment under the FHA and under the Equal Protection Clause. The City Council denied Developers' request for rezoning despite the advice of its own experts to the contrary and in the context of what a reasonable jury could interpret as racially charged opposition by Yuma residents. This was the only request for rezoning that the City had denied in the last three years or of the last 76 applications. We reverse the district court because it failed to give sufficient weight to the City Council's alleged capitulation to the animus of the development's opponents, in the face of the City's own expert's recommendation to

approve the request and its practice of generally granting these requests. Given these circumstances, the complaint passes the plausibility bar. We remand to the district court on these claims.

We also reverse and remand the district court's grant of summary judgment in favor of the City on Developers' disparate-impact claim and vacate its denial of the second summary judgment motion as moot. We reject the district court's view that other similarly-priced and similarly-modelled housing available elsewhere necessarily precluded a finding that there was a disparate impact. We remand for the district court to address the City's second motion for summary judgment in the first instance.[1]

## JURISDICTION

The district court had jurisdiction over Developers' § 1983 claims under 28 U.S.C. §§ 1331 and 1343 and over Developers' FHA claims under 28 U.S.C. § 1331. *See Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1085 (9th Cir. 2000). We have jurisdiction over Developers' appeal under 28 U.S.C. § 1291. *See Budnick v. Town of Carefree*, 518 F.3d 1109, 1113 (9th Cir. 2008).

## LEGAL STANDARDS

Dismissal of a complaint under Rule 12(b)(6) is inappropriate unless the complaint fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

---

[1] In that motion, the City contends that Developers have failed to proffer statistical evidence demonstrating a substantial disparate impact resulting from the zoning denial.

*Twombly*, 550 U.S. 544, 570 (2007). "When the district court denies leave to amend [a complaint] because of futility of amendment, we will uphold such denial if it is clear, upon *de novo* review, that the complaint would not be saved by any amendment." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 893 (9th Cir. 2010). A district court's grant of summary judgment is also reviewed de novo. *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1156 (9th Cir. 2013).

## FACTUAL BACKGROUND

According to the complaint, Plaintiffs, Avenue 6E Investments, LLC and Saguaro Desert Land, Inc. are business entities owned by members of the Hall family, who develop housing in Yuma, Arizona. Through Developers and other affiliated companies, members of the Hall family have developed various affordable and moderately priced housing projects in Yuma. Thus, Developers are sometimes referred to as "Hall" or "Hall Construction." Developers allege that even though the Hall family's affiliated companies build a full range of housing products, they nevertheless have a reputation as a developer of Hispanic neighborhoods based upon their development of several affordable housing projects in Yuma in which the majority of homes were sold to Hispanics.

Avenue 6E owned 42 acres of undeveloped land in southeastern Yuma (the "Property"), and granted Saguaro an option to purchase the Property for the purpose of developing a "moderately priced" housing project. As Developers state in their opening brief on appeal, their references to their proposed development as "affordable" and "moderately priced" are descriptive only and do not imply that such

projects are considered "affordable" as defined by the United States Department of Housing and Urban Development. Developers allege that the City denied a requested zoning change in September 2008 in response to animus by neighbors of the proposed development who wished to prevent the development of a heavily Hispanic neighborhood adjacent to their subdivisions, in which 75% of the population was White.

Between 2002 and 2010, the City performed two analyses—specifically, the Consolidated Plan and Analysis of Impediments to Fair Housing Choice for 2002, as well as a 2007 version by the same name (respectively, the "2002 Analysis of Impediments" and the "2007 Analysis of Impediments")—each showing that the Hispanic population in Yuma was concentrated in several areas in the northern, western, and central portions of the City. The analyses show that substantially all of the available low- to moderate-income housing was located in those areas, and that more than 75% of the households in that housing were Hispanic. The reports found that, by contrast, Whites were concentrated in separate areas in the northwest and southeast of Yuma in which they comprised more than 75% of the population. The Property is on the western boundary of what was, at that time, one of the White-majority areas in the Southeast portion of Yuma.

The City's General Plan prohibits actions promoting racial segregation, and its 2002 Analysis of Impediments recognizes the need to encourage the development of more affordable housing choices to low- and moderate-income citizens outside the areas with high concentrations of Hispanic households. The 2002 Analysis warned, however, that residents had used "NIMBY" (not-in-my-backyard) arguments to block or delay several affordable housing

developments; the Analysis thus recommended an educational campaign to promote acceptance of affordable housing, lower-income neighborhoods, and cultural diversity. The General Plan acknowledges that large-lot zoning raises housing costs and impairs the availability of housing affordable to low- and moderate-income purchasers, and identifies higher-density zoning as a means for the City to encourage desegregation. The 2002 General Plan noted wealth disparities within Yuma, stating that "Hispanic, African American and Native American households are more likely to have lower income and live below the poverty line."

The City's General Plan designates the Property for use as "Low Density Residential." This designation encompasses two permissible zoning designations: "R-1-6" zoning, which allows development of a residential subdivision of houses placed on 6,000 square foot lots, and "R-1-8" zoning, which requires the use of at least 8,000 square foot lots. In 2006, Developers purchased the Property from KDC of Yuma, LLC ("KDC"), another housing developer, which had previously rezoned the Property from agricultural use to R-1-8. The Property is bordered on the south by the 38-acre "Belleza Subdivision," which consists of homes on lots exceeding 9,000 square feet; on the north by the "Country Roads" recreational village, consisting of 2,500 square foot lots limited to persons age 55 and over; on the west by the 80-acre "Terra Bella Subdivision" owned by Perricone Development Group II ("Perricone"), a developer of luxury homes; and to the east by a parcel the City intends to use to expand a wastewater facility and a municipal park.

In 2008, Developers determined that development of the Property with R-1-8 zoning was no longer financially feasible due to the collapse of the housing market and a corresponding

difficulty in selling 8,000 square foot lots. They determined, however, that there existed a need in Yuma for more affordable housing, and designed a higher-density, moderately priced housing project for the Property consistent with the City's General Plan and consisting of 6,000 square foot lots. Developers subsequently applied to rezone the Property from R-1-8 to R-1-6. The City's staff and in-house planning experts both recommended approval of the zoning request.

Subsequently, the City Planning and Zoning Commission held a public hearing on Developers' zoning application. Several homeowners from the Belleza Subdivision wrote letters or spoke at the hearing objecting that Developers "catered" to low- to moderate-income families. They complained that the people living in "the Hall neighborhoods" tended to have large households, use single-family homes as multi-family dwellings, allow unattended children to roam the streets, own numerous vehicles which they parked in the streets and in their yards, lack pride of ownership, and fail to maintain their residences. These characteristics, Developers allege, coincide with a stereotypical description of Yuma's Hispanic neighborhoods. The Commission voted unanimously to approve the rezoning request, noting that many subdivisions with small-sized lots had previously been built adjacent to large-sized lot subdivisions without incident. The rezoning request was then forwarded to the City Council with the recommendations of the Planning Staff and the Planning and Zoning Commission that the request be granted.

Prior to rendering its decision, the City Council received complaints from landowners near the Property commenting on the fact that Developers build affordable housing and

criticizing the proposed development in terms Developers allege are well-known in Yuma as descriptive of Hispanic neighborhoods. One landowner complained that Developers' proposal would create "a low cost, high crime neighborhood." The City Council held a public hearing. Several landowners attending the hearing brought photographs of Developers' Trail Estate Subdivision, in which 77% of homebuyers were Hispanic, which they identified as an "affordable housing project." One Belleza homeowner sent the following letter asking the City Council to deny Developers' rezoning request:

> We as well as many other families are very aware of the type of 'homes' and 'neighborhoods' the 'Hall Construction' company has built in the past. If any of the council members are unaware of what I am referring to, I urge them to please drive through the many 'Hall' neighborhoods in particular the ones with the comparable price and square footage that the Halls have proposed to build next to us. After doing so I ask council members to please ask themselves if they would want to live around these areas after having paid such a significant amount for their home. . . . From my first hand experience in comparing these Hall subdivisions with our subdivisions particularly Kerley subdivision, it is evident that the Hall subdivision has a higher rate of unattended juveniles roaming the streets, as well as domestic violence, theft, burglaries, and criminal damage/vandalism to properties. It was my experience that many owners of

these homes left juveniles unattended as well as many of these homes were not single family dwellings like they were designated to be and instead turned into multifamily dwellings which in turn led to more unattended juveniles and crime. . . . We find it very disappointing that we have worked very hard to keep out children out of areas like this, as well as worked very hard to come up with the funds in order to buy the home that we live in. Now we are faced with the possibility that once again the Hall Construction company wants to add another one of these 'subdivisions' in Yuma.

Another landowner sent a letter to the Council stating that:

According to the US Department of Justice, households with incomes of less than $75,000 account for 91% of all crimes nationally as well as 91% of all rape, murder, assault, armed robbery, etc. The type of lots and houses that Hall Construction is considering will be catering to this group of people. What will this cost the city and county of Yuma to patrol this area and how many innocent victims from Belleza, Terra Bella and Tillman Estates will fall victim to a predator in this 91% demographic?

A third landowner complained that graffiti is a problem in small-home subdivisions. One Councilmember described the Hall Companies' subdivisions as having cars parked on the streets and in yards, and asked whether the garages

envisioned for the Property would be large enough to accommodate pickup trucks.

Developers proposed creating a "buffer" zone of 8,000 square foot lots separating the Property from the Belleza and Terra Bella subdivisions, with 6,000 square foot lots placed between the buffer zone and the Country Roads RV park. One landowner commented that Developers' proposal would create a smooth transition in terms of lot size, but not of "ownership demographics." Reacting to the criticism of Developers' proposal, a City Council member stated that subdivisions of different densities will inevitably abut each other, and voiced his concern that denying Developers' application on the basis of the community's concerns would create an "unsustainable precedent" for future zoning decisions.[2] At the conclusion of the hearing, the City Council denied Developers' rezoning request.[3] This rezoning request was the only one of 76 applications considered by the City Council over the preceding three years that it had rejected.

## PROCEDURAL BACKGROUND

Developers commenced this action in February 2009, alleging a claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment and

---

[2] Although the Second Amended Complaint identifies the speaker as the Yuma Mayor, Developers state in their Opening Brief that the speaker was in fact a member of the City Council.

[3] Although not relevant to the complaint (or motion to dismiss), the City disputes Developers' account and maintains that it denied the zoning request because property owners had relied upon the pre-existing R-1-8 zoning designation and because Developers, rather than the City, rejected a compromise buffer-zone plan.

claims of disparate impact and disparate treatment under the Fair Housing Act (FHA), 42 U.S.C. § 3601 *et seq*. In early 2010, the district court granted the City's motion to dismiss Developers' disparate-treatment claims under the Equal Protection Clause and the FHA,[4] but denied the City's motion as to Developers' disparate-impact claim under the FHA.[5] Later that year, Developers filed a motion for leave to file a Second Amended Complaint, which attempted, inter alia, to add additional facts, including the fact that the Developers' rezoning request was the only one rejected out of 76 in the preceding three years. The district court denied this motion to amend on the ground that amendment would be futile.

After completing discovery on Developers' remaining claim, the disparate-impact claim, the City filed two motions for summary judgment regarding that claim. The first motion contended that Developers could not prove disparate impact because there was an adequate supply of similarly priced and modelled housing in the Southeast quadrant of Yuma and that "on this separate and distinct basis alone" summary judgment should be granted. In that motion, the City proffered no other reason for the grant of summary judgment. Four days later, the City filed the second motion, in which it contended that (1) Developers' had failed to show a disparate impact on Hispanics resulting from the denial of the rezoning

---

[4] We refer to both the claim for intentional discrimination under the Equal Protection Clause and the disparate-treatment claim under the FHA as "disparate-treatment claims" for ease of analysis.

[5] The district court also dismissed Developers' substantive due process claims under the Federal and Arizona Constitutions as well as a claim under Arizona Revised Statute § 9-452-01(F), which requires that rezoning ordinances conform to the adopted general plan of the municipality. Developers do not appeal the dismissal of these claims.

application, and (2) the City denied the rezoning application for legally sufficient reasons.  The district court granted the City's first summary judgment motion,[6] expressly stating that it did not reach the issues raised by the second motion, and then denied the second motion as moot.[7]  It entered judgment, holding that the adequate supply of similarly-priced and modelled housing in Southeast Yuma foreclosed any finding of disparate impact.  *Ave. 6E*, 2013 WL 2455928, at *2, *7.  The district court also rejected Developers' perpetuation-of-segregation theory for its disparate-impact claim.  It held that undisputed statistics showed that "the integrative effect of that development . . . would not have been significant enough to support a disparate impact claim" based on the perpetuation-of-segregation theory.  *Id.* at *7.  Developers timely appealed.

## ANALYSIS

Developers challenge the district court's dismissal of their disparate-treatment claims and grant of the City's first motion for summary judgment on the disparate-impact claim.  We first outline the avenues for relief available under the FHA and then turn to the issues presented by this appeal.

## I.

Enacted in the late 1960s following the assassination of Dr. Martin Luther King Jr., the Fair Housing Act came at a

---

[6] *Ave. 6E Invs., LLC v. City of Yuma*, 2013 WL 2455928 (D. Ariz. 2013).

[7] Order and Opinion on Motion for Summary Judgment, *Ave. 6E Invs., LLC v. City of Yuma*, No. 09-00297 (D. Ariz. June 5, 2013), ECF No. 190.

time of "considerable social unrest." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmties. Project, Inc.*, 135 S. Ct. 2507, 2516 (2015). By the mid-1960s, Congress had addressed discrimination in public accommodations and voting through major legislation; yet, it had failed to tackle discrimination in housing, the area that determined millions of citizens' daily life experiences, as well as who their neighbors would be, which schools their children would attend, and the general social environment in which they would grow up or live. Combined with the advent of Levittown-like suburban developments across the country, "various practices . . . , sometimes with governmental support, . . . encourage[d] and maintain[ed] the separation of the races," including racially restrictive covenants, blockbusting, and redlining. *Id*. at 2515. Government policy, which promised not to change a neighborhood's composition when constructing affordable housing, exacerbated the stark segregation in America's cities. Brief for Housing Scholars as Amici Curiae Supporting Respondents, *Texas Dep't of Hous.* (No. 13-1371), 9–16. Altogether, as the Kerner Commission warned, the nation was "moving towards two societies, one black, one white—separate and unequal." *Texas Dep't of Hous.*, 135 S. Ct. at 2516 (quoting Report of the National Advisory Commission on Civil Disorders 1 (Kerner Commission)). It took this "grim prophecy," and the social unrest that gripped the country following the murder of Dr. King, for Congress to act and pass the FHA. *Id*. at 2516, 2525.

The FHA declares that "it is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. To achieve this goal, the FHA renders it unlawful to, among other things, "make unavailable or deny, a dwelling to any

person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a).  As relevant to this case, it provides several tools to do so.

First, and most obvious, it prohibits   intentional discrimination—that is, disparate treatment.   A private developer or governmental body cannot refuse to sell or rent housing to someone because of that person's race, religion, gender, or other protected characteristic, nor can a government zone land or refuse to zone land out of concern that minorities would enter a neighborhood. *See Pac. Shores Props.*, 730 F.3d at 1157 (noting that the FHA prohibits discriminatory zoning practices).  If a governmental actor engages in this discrimination, such conduct also violates the Equal Protection Clause. *Arlington Heights v. Metro. Hous. Corp.*, 429 U.S. 252, 265–66 (1977) (noting, in the context of a zoning challenge, that "[w]hen there is a proof that a discriminatory purpose has been a motivating factor" in a government decision, judicial deference to that decision is not justified under the Equal Protection Clause).

Given the long history and dire consequences of continuing housing discrimination and segregation, Congress did not stop at prohibiting disparate treatment alone.  Indeed, in enacting the FHA, Congress sought "to eradicate discriminatory practices within a sector of our Nation's economy." *Tex. Dep't of Hous.*, 135 S. Ct. at 2522.  To this end, as the Supreme Court recently reaffirmed, the FHA also encompasses a second distinct claim of discrimination, disparate impact, that forbids actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason. *Id.* at 2522.  Disparate impact provides a remedy in two situations that disparate

treatment may not reach.  First, "[i]t permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification." *Id.*; *see also Huntington Branch, N.A.A.C.P. v. Huntington*, 844 F.2d 926, 935 (2d Cir. 1988) (noting that "clever men may easily conceal their motivations" and that disparate-impact analysis is needed because "[o]ften, such [facially neutral] rules bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied").  Second, disparate impact not only serves to uncover unconscious or consciously hidden biases, but also targets "artificial, arbitrary, and unnecessary barriers" to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities. *Tex. Dep't of Hous.*, 135 S. Ct. at 2522.  In this way, disparate impact "recognize[s] that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." *United States v. City of Black Jack, Mo.*, 508 F.2d 1179, 1185 (8th Cir. 1974).

Today, the policy to provide fair housing nationwide announced in the FHA remains as important as ever. 42 U.S.C. § 3601.  While "many cities have become more diverse" after "the passage of the [FHA] and against the backdrop of disparate-impact liability in nearly every jurisdiction," *Texas Dep't of Hous.*, 135 S. Ct. at 2525, housing segregation both perpetuates and reflects this country's basic problems regarding race relations: educational disparities, police-community relations, crime levels, wealth inequality, and even access to basic needs such as clean water and clean air.  In this country, the neighborhood in which a person is born or lives will still far too often determine his or her opportunity for success.  As the

Supreme Court recognized, the FHA must play a "continuing role in moving the Nation toward a more integrated society" and a more just one.  *Id.*

Given this context, we now turn to Developers' claims in this case.

## II. Disparate-Treatment Claims

Developers first bring disparate-treatment claims under the FHA and the Equal Protection Clause, alleging that the City refused their request to rezone the Property because of discrimination or animus against Hispanics.  The district court dismissed these claims and found the request for leave to amend futile, holding that Developers did not allege plausible claims for relief in the first or seconded amended complaints.  Although Developers appeal both the dismissal of their first amended complaint and the district court's denial of their motion for leave to file a second amended complaint, we address only whether the second amended complaint stated a plausible claim for relief because the first and second amended complaints were both rejected based on plausibility and because the second amended complaint would have "supersede[d] the original" if allowed.  *See Ramirez v. Cnty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015); *see also Dorf v. Bjorklund*, 531 F. App'x 836, 837 (10th Cir. 2013) (ruling only on motion for leave to amend when the plaintiffs appealed the dismissal of the first amended complaint and the denial for leave to file a second amended complaint on the basis of futility).  Because the second amended complaint contains sufficient allegations that the City's decision was driven by animus to state a plausible claim for relief, we hold that the amendment was not futile and reverse the dismissal of the disparate-treatment claims.

*Arlington Heights* governs our inquiry whether it is plausible that, in violation of the FHA and the Equal Protection Clause, an "invidious discriminatory purpose was a motivating factor" behind the City's decision to deny the zoning application. *Arlington Heights*, 429 U.S. at 266. Under *Arlington Heights*, a plaintiff must "'simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely that not motivated' the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Pac. Shores Props.*, 730 F.3d at 1158 (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)). "A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'" *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (quoting *Arlington Heights*, 429 U.S. at 266). The court analyzes whether a discriminatory purpose motivated the defendant by examining the events leading up to the challenged decision and the legislative history behind it, the defendant's departure from normal procedures or substantive conclusions, and the historical background of the decision and whether it creates a disparate impact. *Id.* (citing *Arlington Heights*, 429 U.S. at 266–68, and *Pac. Shores Props.*, 730 F.3d at  at 1158–59). These elements are non-exhaustive, *Arlington Heights*, 429 U.S. at 268; *Pac. Shores Props.*, 730 F.3d at 1159, and a plaintiff need not establish any particular element in order to prevail, *see Pac. Shores Props.*, 730 F.3d at 1156 (stating that, for the purpose of summary judgment, "any indication of discriminatory motive may suffice to raise a question that can only be resolved by a factfinder"). We examine each in turn.

## A.  Sequence of Events Leading Up to the Challenged Decision and the Legislative History

The gravamen of Developers' disparate-treatment claims is that the City discriminated against them by denying their application in order to appease its constituents, despite knowing that opposition to the application was based largely on racial animus, and despite the recommendations of its zoning commission and planning staff and its regular practice.  Here, the allegations in the complaint are sufficient to raise these claims.

The presence of community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views.  *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997), *superseded on other grounds as recognized in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (plaintiff alleging a disparate-treatment claim under the FHA "can establish a *prima facie* case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." (internal quotation marks omitted)). This standard "recognize[s] the reality of such controversial proposals in the urban setting," *United States v. City of New Orleans*, 2012 WL 6085081, at *9 (E.D. La. Dec. 6, 2012), in which council members may vote based on constituents concerns about "an influx of undesirables" into the neighborhood.  *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982).

Neither *Budnick* nor *Arlington Heights*, which the City cites to support its position, holds otherwise. In *Budnick*, the plaintiff sought a special use permit to build a continuing-care retirement community and, only after the Town Council denied his application, raised for the first time the contention that the planned facility would serve disabled residents; plaintiff in his prior declarations had asserted that residents would be limited to "healthy, active, independent seniors." *Budnick*, 518 F.3d at 1112–13. This alone undercut any finding of discriminatory intent by the Town Council, as the plaintiff failed to explain how the Town could have discriminated against residents it did not know would be housed at the facility. Here, by contrast, Developers allege that their reputation as developers of subdivisions favored by Hispanics, and the general demographic trends suggesting that the higher-density development they proposed would attract a greater number of Hispanic homebuyers, were known prior to the denial of their application. Accordingly, here, unlike in *Budnick*, community members' opposition to Developers' application, using language indicating animus toward a protected class, provides circumstantial evidence of discriminatory intent by the City.

The facts of *Arlington Heights* likewise do not support defendant's argument. In that case, the Supreme Court affirmed the district court's finding following a trial that, although some opponents of plaintiffs' requested zoning change might have been motivated by opposition to minority groups, the evidence did not warrant the conclusion that this motivated defendants. 429 U.S. at 269–70. Unlike this case, the Supreme Court in *Arlington Heights* was required to review the district court's factual finding for clear error after a trial, while here we must accept Developers' allegations as true and review the district court's order de novo. *See*

*Anderson v. City of Bessemer City*, 470 U.S. 564, 566 (1985); *Newark Branch, N.A.A.C.P. v. City of Bayonne, N.J.*, 134 F.3d 113, 119–20 (3d Cir. 1998).  Moreover, other facts not similar to any before the district court on the present motion to dismiss supported the district court's factual finding in *Arlington Heights*.  For example, as the Supreme Court noted, the area surrounding the site of the desired zoning change to permit high-density zoning had been zoned for single-family homes for more than a decade, and the zoning change would have been contrary to a "buffer policy" consistently applied in prior instances.  429 U.S. at 269. Here, by contrast, the R-1-6 zoning sought by Developers was entirely consistent with the City's General Plan.

Although the relevant cases clearly hold that a city's denial of a zoning change following discriminatory statements by members of the public supports a claim of discriminatory intent, the question remains whether the statements alleged in Developers' Second Amended Complaint actually constituted animus.  None of the alleged statements expressly refers to race or national origin; rather, they raise various concerns about issues including large families, unattended children, parking, and crime.  We have held, however, that the use of "code words" may demonstrate discriminatory intent.  *Galdamez v. Potter*, 415 F.3d 1015, 1024 n.6 (9th Cir. 2005) (citing *McGinest*, 360 F.3d at 1117). In *McGinest*, we adopted the reasoning of the Third Circuit's opinion in *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996).  Considering comments that plaintiff, an African American, was a "drug dealer," we quoted *Aman* at length:

> [A] reasonable jury could conclude that the intent to discriminate is implicit in these

> comments.    There    are    no    talismanic
> expressions which must be invoked as a
> condition-precedent to the application of laws
> designed to protect against discrimination.
> The words themselves are only relevant for
> what they reveal–the intent of the speaker.  A
> reasonable jury could find that statements like
> the ones allegedly made in this case send a
> clear message and carry the distinct tone of
> racial motivations and implications.    They
> could be seen as conveying the message that
> members of a particular race are disfavored
> and that members of that race are, therefore,
> not full and equal members of the workplace.

*McGinest*, 360 F.3d at 1117 (quoting *Aman*, 85 F.3d at 1083) (alteration in original).  The *McGinest* court then held that "[t]he reference to [plaintiff, an African-American] as a 'drug dealer' might certainly be deemed to be a code word or phrase" demonstrating animus.  *Id.*; *see also Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 974 (8th Cir. 2012) ("[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications.") (quotation marks omitted) (alteration in original); *Jenkins v. Methodist Hosps. of Dallas*, 478 F.3d 255, 265 (5th Cir. 2007) (citing *Aman*, 85 F.3d at 1083).  Whether a code word evidences racial animus may depend upon factors including local custom and historical usage.  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).  Although these cases involve employment rather than housing discrimination, these lessons are equally applicable to both types of cases.  *See Texas Dep't of Hous.*, 135 S. Ct. at 2522–23.

Here, construing the allegations in the complaint in favor of plaintiffs as well as drawing all inferences in their favor, the alleged statements by the neighborhood opposition submitted to city officials contained such code words consisting of stereotypes of Hispanics that would be well-understood in Yuma.  Neighbors expressed concern that the type of people living in "the Hall neighborhoods" had large households and used single-family homes as multi-family dwellings.   These people, neighbors complained, own numerous vehicles which they park in the streets and yards, fail to maintain their residences, and lack pride of ownership. They also allow unattended children to roam the streets (what some may call letting children play in the neighborhood). Several landowners attending the public hearing even brought pictures of another Hall subdivision, in which 77% of the homebuyers are Hispanic, to exemplify the complaints they had about the potential new development.  *See Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 641 F. Supp. 2d 563, 571–72 (E.D. La. 2009) (repeated references to Village Square, where Village Square was a local complex with a significant black population, demonstrated racial animus).  After Developers presented their compromise plan to transition from the 8,000-foot lots down to 6,000-foot lots near the RV park, another landowner noted that it would be a smooth transition in terms of lot size, but not ownership demographics, suggesting—at least to a reasonable juror—a change in racial composition.  In sum, landowners worried that the type of people who live in "Hall neighborhoods" create a "low cost, high crime neighborhood" that these landowners had worked hard "to keep our children out of." *See id.* (finding references to crime were "racially-loaded"); *Atkins v. Robinson*, 545 F. Supp. 852, 874 (E.D. Va. 1982) (reference to "an abundance of crime" "may be interpreted as [a] veiled reference[] to race").

Taken together, these allegations, along with the allegation that Developers are known to many as a developer of Hispanic neighborhoods on the basis of their housing projects in Yuma, provide plausible circumstantial evidence that community opposition to Developers' proposed development was motivated in part by animus, and that the City Council was fully aware of these concerns when it took the highly unusual step of acceding to the opposition and overruling the recommendations of its zoning commission and planning staff.

## B. City's Departure from its Normal Procedures or Substantive Conclusions

Developers also plausibly allege that the denial of their zoning application departed from the City's normal procedures. In denying the rezoning, the City Council's decision ran contrary to the unanimous recommendation provided by the City's Planning and Zoning Commission, as well as the recommendation of City planning staff. A city's decision to disregard the zoning advice of its own experts can provide evidence of discriminatory intent, particularly when, as here, that recommendation is consonant with the municipality's general zoning requirements and plaintiffs proffer additional evidence of animus. *See Innovative Health Sys.*, 117 F.3d at 49 (affirming grant of preliminary injunction and stating that city's zoning body "ignored the requirements of the 'hospital or sanitaria' classification and did not explain why it declined to follow the Corporation Counsel's straightforward analysis"); *Sunrise Dev., Inc. v. Town of Huntington, N.Y.*, 62 F. Supp. 2d 762, 775, 776 (E.D.N.Y. 1999) (concluding that Town's disregard of its Citizen's Advisory Committee's recommendation suggested that "defendants likely were swayed by the anti-disabled animus

present in the community"); *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 572 (N.D. Tex. 2000) ("[Defendant's] history of ignoring the recommendations of its planners and proceeding in the face of sound legal and planning advice" weighed towards finding of discriminatory intent); *MHANY Mgmt. Inc. v. Cnty. of Nassau*, 843 F. Supp. 2d 287, 321–22 (E.D.N.Y. 2012) (city's decision to disregard its own consultant's zoning recommendation and the County's desires supported finding of discriminatory intent); *but cf. Hallmark Developers*, 466 F.3d at 1285 (finding County Board's decision to ignore recommendations of approval from its staff and planning bodies was not suspect because no larger context demonstrated racial animus). Developers' allegation that the City's prior zoning decisions permitted "many examples in Yuma where large lot expensive subdivisions had been built next to moderately priced small lot housing subdivisions without problems" further underscores the inference that the decision to deny Developers' application was contrary to normal procedures. Finally, this zoning request was the only request the City Council denied of the 76 considered over the three years preceding the Council's decision. Drawing all reasonable inferences in Developers' favor, the City's singling out of their zoning request for denial supports Developers' contention that the City had a discriminatory intent.

## C. Disparate Impact and the Historical Background of the Decision

The complaint's statistics on the disparate impact caused by the decision and the historical background of the decision also tend to make the disparate-treatment claims plausible.

Developers allege specific facts demonstrating city officials' awareness that the effect of their denial of Developers' application would "bear[] more heavily on one race than another" in light of historical patterns of segregation by race and class.[8]     Specifically, they allege facts demonstrating that distinct areas of the city historically have been populated, respectively, by lower class Hispanics and more affluent Whites.  They point to the 2002 and 2007 Analyses of Impediments, each of which shows that "substantially all of the available low- to moderate-income housing" in Yuma has historically been concentrated in three areas of the city in which more than 75% of the households are Hispanic, whereas Whites have been concentrated in two other areas in which the White population has been more than 75%.[9]  They also allege facts contained in the City's General Plan and the U.S. Census identifying a direct relationship between housing density and costs, and demonstrating a

---

[8] Even though the proposed development would not have qualified as "affordable" under HUD regulations, alleged facts regarding the distribution of affordable housing in Yuma's Hispanic neighborhoods help demonstrate general income stratification supporting the inference that Hispanics in Yuma are generally less affluent than Whites and would be more likely to purchase homes built on the smaller lots proposed by Developers.

[9] Although not relevant to our consideration of the district court's dismissal of the disparate-treatment claim pursuant to Rule 12(b)(6), new data developed during the summary judgment phase showed that this percentage has changed in Southeast Yuma as a whole, though not necessarily in any particular part of that quadrant of the City.  While the City's 2002 and 2007 Analysis of Impediments noted that Southeast Yuma had a White population of 75%, the 2012 version of the same report shows that the White population in that area as a whole decreased to between 48% and 65% (meaning that the Hispanic population was likely between 30% and 47%, with 5% being other).

significant disparity (29%) between the median income of Yuma households headed by Hispanics and Whites.

Based upon these facts, Developers assert that the City's denial of their application to build moderately priced housing will have a disproportionate effect on Hispanics. Developers' allegations, accepted as true, support the inference that "the [City's] decision does arguably bear more heavily on racial minorities." *Arlington Heights*, 429 U.S. at 269. Drawing all inferences in Developers' favor, these allegations demonstrate a historical background of stratification by race and class, indicating the City's denial of Developers' application to build moderately priced housing will have a disparate impact on Hispanics by denying them affordable opportunities to move into communities long dominated by more affluent Whites.

Developers also allege facts suggesting a prior history of animus in Yuma housing developments. Specifically, they allege facts reported in the 2002 Analysis of Impediments demonstrating a history of NIMBY opposition to the development of affordable housing developments and appearing to link such opposition at least in part to animus, because the reports' authors include among their recommendations that the City collaborate on community events celebrating cultural diversity. This further supports Developers' claims that animus helped motivate the community opposition leading to the City Council's decision to deny their zoning application.

Citing the Seventh Circuit's decision on remand in *Arlington Heights* and the Second Circuit's decision in *Huntington Branch*, *N.A.A.C.P.*, the City argues that the facts before us fail to demonstrate an intent to discriminate because

they fall short of the facts in cases finding an intent to discriminate in municipalities with a long history of completely barring certain types of housing or restricting its development to only certain locations. *See Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1294 (7th Cir. 1977); *Huntington Branch, N.A.A.C.P. v. Huntington*, 844 F.2d 926, 928 (2d Cir. 1988). That the facts alleged here are not as egregious as the facts in other cases in which plaintiffs prevailed is of no consequence. Developers need not demonstrate a complete absence of desired housing for Hispanics to prevail; discriminatory zoning practices violate the FHA even if they only *"contribute* to 'mak[ing] unavailable or deny[ing] housing'" to protected individuals. *Pac. Shores Props.*, 730 F.3d at 1157 (quoting *City of Edmonds v. Wash. State Bldg. Code Council*, 18 F.3d 802, 805 (9th Cir. 1994) (alterations in original) (emphasis added)). Moreover, at this stage of the proceedings all inferences must be drawn in the plaintiffs' favor and those inferences alone are sufficient to preclude dismissal of the claims regarding disparate treatment.

## D. Conclusion

After public hearings filled with what a reasonable jury could interpret to be racially tinged code words, the City Council denied Developers' rezoning request, overriding the unanimous vote of the planning commission and denying a rezoning request for the first time in three years. For the reasons explained above, we hold that Developers' complaint sufficiently alleges claims of disparate treatment under the FHA and Equal Protection Clause. We hold that the claims of disparate treatment are, on the basis of the complaint before us, plausible and therefore reverse the district court's dismissal of these claims.

### III.  Disparate-Impact Claim

Developers next assert that the district court erred in granting the City's first summary judgment motion as to the claim that the denial of the zoning request caused a disparate impact on Hispanics. The motion was granted on the sole ground raised by the City: similarly-priced housing was available elsewhere in Southeast Yuma; therefore, no disparate impact could be established.[10]  We reject that ground and hold that when a developer seeks to rezone land to permit the construction of housing that is more affordable, a city cannot defeat a showing of disparate impact on a minority group by simply stating that other similarly-priced and similarly-modelled housing is available in the general area.[11]

### A.

Developers presented a request to the City to change the zoning of their land from lower-density to higher-density housing.  They did so mainly for financial reasons—lower-density housing was not selling after a recession, and they

---

[10] Alternative housing elsewhere in the area was the only ground on which the district court relied in granting summary judgment on this claim.  The Developers, however, had an additional claim of disparate impact based on a perpetuation-of-segregation theory.  As discussed below, the district court granted summary judgment on the perpetuation-of-segregation claim for the reason that undisputed statistics showed that the denial of the zoning application would not have a significant segregative effect on the neighborhood.  We affirm that ruling, *infra* at 38.

[11] We do not address arguments in the second summary judgment motion, including the City's contention that Developers have failed to proffer statistical evidence demonstrating a substantial disparate impact resulting from the zoning denial.

believed that higher-density units might sell more easily. The City argued in its first summary judgment motion only that the availability of similarly-priced and modelled housing in other parts of Southeast Yuma necessitated summary judgment in its favor. Developers' statistics demonstrating that Hispanics would be more likely to buy homes in the zoned area if the proposed higher-density zoning were approved were not at issue. The City, therefore, had a choice of two alternatives, each of which was permissible under its General Plan; one would enable more minority group members to purchase homes in an area with a white majority population than would the other. It chose the other.

As noted above, in the 1960s and earlier, national, state, and local governments had explicit or implicit policies that prevented integration even when developers had an economic rationale for wanting to build more dense or more affordable housing. In *Texas Department of Housing*, the Supreme Court emphasized that disparate-impact liability was designed to reverse this pattern by allowing "private developers to vindicate the FHA's objectives and to protect their property rights by stopping municipalities from enforcing arbitrary and, in practice, discriminatory ordinances barring the construction of certain types of housing units." 135 S. Ct. at 2522. Indeed, the wisdom of disparate-impact liability under the FHA is that it addresses local government's (as well as other government's) historical racism and the continuing persistence of housing segregation not by interjecting racial quotas as the end goal of municipal zoning decisions, but rather by ensuring that municipalities making such decisions will base them on legitimate objectives rather than on discriminatory reasons, conscious or otherwise. Moreover, when such decisions may still cause a disparate impact, the municipality and the developer are instructed to

attempt to minimize that impact by determining whether there is an alternative that accommodates both the city's legitimate objective and the developer's legitimate goals. *See* 24 C.F.R. § 100.500 (describing this process under the FHA). Such a thoughtful consideration, under disparate-impact analysis, of how a city's legitimate rationales may be reconciled with the desires of developers to build higher-density affordable housing has helped to change the old patterns prevalent in the 1960s and will continue to help produce a fairer and more just society.

## B.

Adopting the district court's holding, which it arrived at without the benefit of the Supreme Court's decision in *Texas Department of Housing*, would prematurely cut short the carefully constructed mode of analysis that the Court just recently established. Relying on *Hallmark Developers, Inc. v. Fulton County*, 466 F.3d 1276 (11th Cir. 2006), a case decided almost ten years before *Texas Department of Housing*, the district court held that an adequate supply of comparable housing in a quadrant of the City in which the zone is located negated the possibility of any disparate impact from the City's denial of Developers' application.[12]

In *Hallmark*, a Georgia county denied the developer's application to rezone land to build a mixed-use development including affordable housing, and the developer sued.

---

[12] We assume that the Eleventh Circuit, like the district court, would reach a different decision than it did in *Hallmark* with the benefit of the Supreme Court's recent *Texas Department of Housing* decision. In fact, we are not aware of any Eleventh Circuit case that has relied on *Hallmark*'s rule on alternative housing since that decision.

466 F.3d at 1279, 1282.  The developer's expert testified that the denial of zoning that would have allowed the construction of lower-cost housing had a disparate impact on minorities based on data of local home ownership and apartment rentals. *Id.* at 1282.  Despite these statistics, the Eleventh Circuit held that the developer had failed to establish a disparate impact because there was an oversupply of homes in the developer's projected price range in the southern part of the county.  *Id.* at 1287; *see also Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 386 F. Supp. 2d 1369, 1378 (N.D. Ga. 2005) (describing the "South Fulton County" area).  The court reasoned that "[i]f there is a glut in the market of homes in Hallmark's projected price range, the lack of Hallmark's particular development is not likely to have an impact on anyone, let alone adversely affect one group disproportionately."  *Id*.

The district court adopted *Hallmark*'s reasoning, finding that "it is undisputed there was a supply of R-1-6 lots and affordable to moderately priced homes available in the southeast portion of Yuma at the time of the zoning denial and a couple year[s] thereafter," including some lots within two miles of the proposed development in the same price range and featuring the same type of homes.  Citing *Hallmark*, the district court concluded that an adequate supply of comparably-priced and similarly-modelled homes in the area—that is, Southeast Yuma—foreclosed the possibility of any adverse impact resulting from the City's denial of Developers' zoning application, thereby precluding Developers from pursuing a disparate-impact claim.

We disagree.  The availability of similar housing well outside of the zoned property does not affect the analysis whether a city's rejection of a zoning request caused a disparate impact by preventing a higher percentage of

minority group members from purchasing homes. *See Texas Dep't of Hous.*, 135 S. Ct. at 2522. In fact, the *Hallmark* reasoning would threaten the very purpose of the FHA. A local government could deny a developer's request to construct higher-density housing that more members of minority groups could purchase, as long as there was other similarly-priced and modelled housing *anywhere* within a quadrant of a city or the southern or northern part of a county. Indeed, there is no necessary limit to the *Hallmark* theory that similarly-priced and modelled housing located elsewhere would preclude a finding that zoning decisions had an adverse impact on members of minority groups. It would permit cities to block legitimate housing projects that have the by-product of increasing integration simply by scouring large swaths of a city for housing in another part of town that is largely populated by minority residents, that does not compare in any number of respects to the neighborhood in which the developer has sought rezoning, or that is, in fact, far less desirable in general. The *Hallmark* rule ignores the fact that neighborhoods change from mile to mile, if not from block to block, and thereby overlooks the potential for the purposeful creation of majority areas from which minorities may be excluded or of minority areas with few, if any, white homeowners. Such segregated areas, when based on consciously or unconsciously biased decisions that disproportionately, and needlessly, adversely affect minorities, are the antithesis of what the Fair Housing Act stands for. *See Texas Dep't of Hous.*, 135 S. Ct. at 2522.

Similar to the Eleventh Circuit's designation of the entire southern part of a county as the relevant unit for determining whether comparable housing existed, the district court here also considered far too broad an area—an area covering an entire quadrant of the city of Yuma—when determining

whether comparable housing exists. For any family, including those of potential purchasers of homes in the proposed housing development, housing that is a fair distance away from where the family would otherwise choose to live cannot in all likelihood be described as comparable.[13] In other words, minority families that might want to purchase homes in the zoned area would almost certainly be adversely affected by the denial of the zoning application if the existence of available housing in a distant neighborhood were deemed dispositive.

Our rejection of the *Hallmark* rule does not mean that the existence of available housing in close proximity is irrelevant to determining whether a plaintiff proves a disparate impact. Indeed, if a city shows that truly comparable housing is available in close proximity to a proposed development, such a showing would be a relevant factor in deciding whether its zoning decision had a disparate impact in that circumstance. Truly comparable housing, however, is not simply a question of price and model, but also of the factors that determine the desirability of particular locations—factors such as similarly or better performing schools, comparable infrastructure, convenience of public transportation, availability of amenities

---

[13] The City contended at oral argument that such a rule is permissible because Developers conceded that any housing at the same price as the proposed development in the whole Southeast quadrant of Yuma would be "similar housing." Not so. Although Developers' complaint and summary judgment briefing noted that Southeast Yuma had been historically segregated, Developers do not assert that all housing in the same price range in Southeast Yuma would be equivalent. In fact, Developers spent several pages of their summary judgment brief emphasizing that other available housing in Southeast Yuma that the district court cited was, for example, in a "different, less desirable part of Yuma."

such as public parks and community athletic facilities, access to grocery or drug stores, as well as equal or lower crime levels. *See Clark v. Universal Builders, Inc.*, 501 F.2d 324, 335 (7th Cir. 1974) (finding homes comparable that "were located in close geographical proximity to plaintiffs' homes and had similar communal amenities such as transportation, schools, churches, and quality of neighborhood"). Thus, in order to determine whether housing outside of the zoned area is comparable, we must determine not only the close proximity of such housing to that area but also the principal characteristics of the neighborhood that affect families' everyday lives.

Rejecting the Eleventh Circuit's and the district court's approach does not, as the district court contended, "effectively place an affirmative duty on governing bodies to approve all re-zoning applications wherein a developer sought to build housing within a particular price range." In addition to mischaracterizing the Developers' contention, this statement misapprehends the applicable law. First, it may be that Developers have, in fact, failed to show a disparate impact on minorities resulting from denial of the rezoning application—as noted, we remand to the district court to assess the arguments advanced by the City in the second motion for summary judgment. Second, a developer's ability to show disparate impact does not impose a duty on a municipality to approve all zoning applications in a particular price range. Instead, as the Supreme Court made clear in *Texas Department of Housing*, such a showing merely requires the city to demonstrate that the action that creates an adverse effect on minorities is supported by adequate justification. 135 S. Ct. at 2522 ("An important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private

developers leeway to state and explain the valid interest served by their policies."); *see also* 24 C.F.R. § 100.500(c) (setting forth burden-shifting framework for disparate-impact claims under the FHA).

Indeed, municipalities that have good cause for denying zoning changes may do so, unless motivated by conscious or unconscious racial bias.  When the developer shows by statistical data that a zoning denial will have a disparate impact on minorities, the city's obligation is to establish a legitimate and credible basis for its decision.  This is not an unreasonable burden.  In fact it is

> a feature of the FHA's programming, not a bug. . . .  We need not be concerned that this approach is too expansive because the establishment of a *prima facie* case, by itself, is not enough to establish liability under the FHA. It simply results in a more searching inquiry into the defendant's motivations— precisely the sort of inquiry required to ensure that the government does not deprive people of housing "because of race."

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 385 (3d Cir. 2011); *see also Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cty. Metro Human Rel. Comm'n*, 508 F.3d 366, 374 (6th Cir. 2007) ("Of course, not every housing practice that has a disparate impact is illegal."); *Metro. Hous. Dev. Corp.*, 558 F.2d at 1290.  In some cases, nonetheless, an adjustment or accommodation can still be made that will allow both interests to be satisfied. *Cf.* 24 C.F.R. § 100.500(c)(3).

In sum, we decline to follow *Hallmark* and reject the district court's determination that the availability of similarly-priced and modelled housing in the same quadrant of the City as the zoned property prevents Developers from showing a disparate impact. We therefore reverse in part the district court's grant of the City's first motion for summary judgment and vacate its decision that the second motion is moot. On remand, the district court may consider the second motion. The parties may, of course, amend their claims as to this motion so as to take into account this opinion and the Supreme Court's opinion in *Texas Department of Housing* as well as any statistical data or other law that may be relevant, including additional data regarding comparable housing in close proximity to the proposed development.

Finally, Developers also raised a separate perpetuation-of-segregation claim of disparate impact. We agree with the district court that they failed to set forth sufficient facts for any such claim. The district court need not address it on remand.

## CONCLUSION

For the foregoing reasons, we reverse the district court's dismissal of the Developers' disparate-treatment claims under the FHA and the Equal Protection Clause and its grant of the City's first summary judgment motion on the disparate-impact on Hispanics claim. We remand the case to the district court for further proceedings consistent with this opinion, including its consideration in the first instance of the

arguments the City presents in its second summary judgment motion, as that motion may be amended.

**REVERSED IN PART, VACATED IN PART, AND REMANDED.**