Filed 6/28/23  Ware v. City of Long Beach CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| ROBERT WARE, | B319617 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV44216) |
| v. | |
| CITY OF LONG BEACH, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Reversed and remanded with directions.

Kyle Todd for Plaintiff and Appellant.

Dawn McIntosh, City Attorney, and Marsha M. Yasuda, Deputy City Attorney, for Defendant and Respondent.

————————————————

Robert Ware appeals from the judgment entered after the trial court granted summary judgment in favor of the City of Long Beach (City). In 2020 Ware, who is Black, was employed as a Special Services Officer (SSO) at the Long Beach Airport (Airport). He contends that, despite having more on-the-job experience in the role than any other candidate for a promotion, he was passed over, while two non-Black candidates were promoted. Ware filed this action, asserting causes of action under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.)[1] for race-based discrimination (§ 12940, subd. (a)) and failure to prevent discrimination (§ 12940, subd. (k)). The trial court granted summary judgment for the City, finding the City had provided legitimate reasons for promoting other candidates over Ware in 2020, and Ware failed to raise a triable issue of fact as to the City's allegedly discriminatory motive.

On appeal, Ware contends he raised triable issues of fact as to the City's discriminatory animus by presenting evidence showing the City's proffered reasons for not promoting him were not worthy of credence, as well as some circumstantial evidence of pretext, including the lack of any promotions of Black candidates, a subjective interview process, and "me too" evidence of discrimination against other Black employees. We agree and reverse.

---

[1] All further undesignated statutory references are to the Government Code.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Ware's Employment with the City*[2]

Ware was initially hired by the City in November 2005 as a field officer.  In 2007 he attained the rank of SSO III-Armed, while stationed at the Port of Long Beach.  In November 2008, after Ware completed his Police Academy training, he was transferred to the Airport.  SSO's may be assigned to the Airport, city jail, marine patrol, or Long Beach City College.[3]  Depending on the assignment, an SSO's duties include protection of property; traffic regulation; law enforcement; issuance of warnings, citations, and violations; and the apprehension and detention of persons suspected of specified illegal activity.  SSO's also interact with members of the public as needed.

Ware remained employed as an Airport SSO III during the approximately 12 years leading up to his application for a promotion in 2020.  During this time, Ware consistently received positive evaluations from his supervisors, along with regular raises due to his "excellent work product."  However, Ware had a series of encounters with senior Airport officials that he believed showed the City had a "pattern of engaging in anti-Black discrimination."  These encounters included a 2008 incident in which a senior officer at the Airport, Bradley Lemmon, sent Ware a comic strip that used the term "'nigga.'"  In 2011 or 2012 Long

---

[2]     The factual background is taken from evidence submitted by the parties in connection with the City's motion for summary judgment.  We note where the facts are in dispute.

[3]     The City's Harbor Department also employs SSO's; however, the Harbor Department has a separate recruitment process from the other branches.

Beach Police Sergeant Mark Coble, who was White (and in charge of the Airport) told Ware in the context of a notice of violation Ware had written, "'[I]f you want to be a ghetto cop, I can send you to the ghetto.'" Around the same time Coble singled Ware out in connection with another notice of violation, telling Ware he came off as "'very intimidating'" compared to another officer who was White. Ware declared the manner in which Coble told him that he was intimidating, along with Coble's prior comment about Ware being a ghetto cop, "made it clear that my race is what made me intimidating to him, not my conduct." Ware kept silent about the discrimination and harassment for fear of retaliation.

From 2009 through 2021 Ware was frequently assigned to serve as acting watch commander/sergeant on his shifts. As acting watch commander, Ware performed SSO IV duties, including daily scheduling, deploying resources and assigning officers where needed, verifying that other officers were at their assigned posts, overseeing the closure of runways, and notifying the Federal Aviation Administration if there was an emergency that would impact airport operations. He also coordinated with local and state law enforcement, handled dignitary support, ensured regulations were followed, responded to all emergency calls, and ensured appropriate law enforcement action was taken by officers.

Ware repeatedly applied for formal promotion to an SSO IV position at the Airport. In 2012 Ware was one of five candidates who interviewed before an all-White panel, which included Lieutenant Michael Lewis from the Long Beach Police Department (LBPD). The panel selected John Raedle, a White officer, for promotion, and the selection was approved by Airport

Director Mario Rodriguez. Raedle was promoted despite the fact he had previously pleaded guilty to driving under the influence (DUI) and had less seniority than Ware.[4] In 2013, while acting as chief of security, Raedle was terminated and replaced by Acting Chief Ronney Wong.

Ware next applied for an open SSO IV position at the Airport in 2014. Two White officers were promoted to SSO IV, Jefferey Litzinger and Rory Willieford.[5] The panel was composed of two White interviewers and one Hispanic interviewer. Willieford, who previously worked in the City's jail system, had no training or experience in law enforcement at the time of his promotion. After making racist remarks to Black employees at the Airport, Willieford was transferred back to his previous position.

Later in the summer of 2014 Ware applied for another SSO IV opening at the Airport. The three-person, non-Black interview panel included LBPD Lieutenant Lewis, Drew Schneider (superintendent of safety and security for the Airport), and Dan

---

[4] The City acknowledged in its interrogatory responses: "City admits Court records reflect in 2007, John Raedle pled guilty to a misdemeanor charge of driving with a blood alcohol content of .08% or more, and he was selected for the promotional position to SSO IV in 2012." The City hired Raedle in June 2007, approximately two years after it hired Ware.

[5] The City disputed that Ware applied for this SSO IV position. In discovery, the City stated, "Plaintiff did not apply for the promotional/transfer position of SSO IV (Classified) for which Jeffrey Litzinger was ultimately selected."

McMullen (assistant director of harbor security).[6] Out of seven qualified candidates, the panel selected for promotion a non-Black candidate, Rouen Khiev, who had less experience than Ware.

In early 2015 another Airport SSO IV position became available. Schneider decided to review the six remaining applications, including Ware's, for the prior open position instead of soliciting another round of applications. Schneider, working with the LBPD sergeant assigned to the Airport, prepared revised "Rating of Promotability" forms for the remaining candidates based on the panelists' notes and interview rating forms. Schneider and the sergeant decided to promote Joey Stites, who was White, to SSO IV.

In 2019 the Airport reached an agreement with the LBPD under which its armed SSO III and IV employees were "integrated" into the LBPD, such that as of August 3, 2019, Armed Airport SSO III's and IV's fell under the LBPD Support Bureau, Security Services Division. Following this integration, recruitment became the formal responsibility of the LBPD.

B.    *Ware's 2020 Interview for SSO IV*

In January 2020 the LBPD announced two SSO IV openings: one for the Airport police section and another for the marine patrol detail. Ware again applied, and was one of 14 qualified candidates. The interview panel was composed of three LBPD officers: Lieutenant Omar Martinez (retired),

---

[6]    The City contends McMullen and Reginald Harrison (who had final approval authority) were both Black, but in its response to Ware's separate statement, the City accepted as undisputed for purposes of summary judgment that both were non-Black.

Sergeant Ryan Watson (who was assigned to the Airport police detail), and Sergeant John McVay (who was assigned to the marine patrol/port police division). McVay prepared the interview questionnaire the panel used to assess the candidates.

McVay had not been trained in the preparation of interview questions; however, he formulated the questionnaire with the guidance of his lieutenant and commander, as well as the LBPD personnel administrator. The questionnaire consisted of five graded questions, each scored from one to five points, along with a sixth unscored catch-all question that allowed the candidates to make a closing statement and indicate their location preference. The questions were:

(1) "Describe your work experience and educational background as they relate to the current position[.]"

(2) "Tell us about a time you had a conflict in the work place, or personal life, and how you resolved the problem[.]"

(3) "What is the most difficult type of employee to supervise and what strategies would you use to effectively supervise them."

(4) "As a supervisor, what would you do to boost the morale and cohesiveness of the employees you supervise?"

(5) "You observe a SSO III being dismissive and rude to a citizen, how would you address the issue[?]"

(6) "Is there anything else you would like to tell us about yourself, or any closing statements you would like to make? Are you interested in working at Marine Patrol and Airport, or do you have a preference?"

Although the City claims the panelists scored the candidates independently, it is undisputed that certain candidate scores were changed before they were finalized. Once the scoring was complete, the three scores for each of the 14 candidates were tallied, and the candidates were ranked based on their combined scores. Two SSO III's from the marine patrol detail received the highest combined scores: Joseph Marino received a 71 (out of 75), and Jonathan Vigil received a 62. Both officers had previously been supervised by a member of the interview panel— Marino by Watson, and Vigil by McVay. Ware came in sixth, with a score of 48.

The combined scores for the 14 candidates were provided to the deputy chief of the LBPD support bureau, Alexander Avila, who approved the promotions for Marino and Vigil. Avila later testified that, from a review limited to the resumes of Marino and Ware, Ware appeared to be the more qualified candidate to fill the Airport SSO IV position. Avila also testified, however, that after reviewing the resumes and screening interview scores he continued to believe Marino was properly promoted over Ware.

C.    *Ware's Complaint*

On November 18, 2020 Ware filed this action against the City. The operative first amended complaint filed December 16, 2020 alleged causes of action for race-based discrimination under FEHA[7] and failure to prevent discrimination. Ware alleged the City repeatedly denied him promotions due to his race. Further,

_____

[7]    Ware also alleged as part of his race discrimination cause of action that the City had discriminated in the provision of benefits pursuant to Labor Code section 4850 for work-related injuries he sustained. Those allegations are not at issue in this appeal.

8

the City failed to provide adequate education, training, and information to its personnel regarding discriminatory practices, thereby failing to prevent discrimination.

On September 30, 2021 the parties stipulated to restrict the discrimination cause of action to acts that had occurred on or after October 13, 2017 (three years prior to Ware's October 13, 2020 complaint filed with the Department of Fair Employment and Housing).

D.      *The City's Motion for Summary Judgment*

On October 21, 2021 the City filed a motion for summary judgment or in the alternative summary adjudication of both causes of action in Ware's operative complaint.  The City argued Ware's claims had no merit and Ware failed to exhaust administrative remedies for his cause of action for failure to prevent discrimination.  Regarding Ware's racial discrimination claim, the City did not dispute that Ware had presented a prima facie case of intentional discrimination.  Instead, it argued Ware could not rebut the City's legitimate nondiscriminatory reasons for the failure to select him for promotion to SSO IV in 2020.

The City proffered four nondiscriminatory reasons for the failure to select Ware:  (1) The panelists independently assessed the qualifications of each candidate using the same neutral questionnaire; (2) the panelists all felt Ware needed more development and did not provide sufficiently detailed answers to the interview questions; (3) the two highest-scoring candidates demonstrated they were better qualified for promotion than Ware; and (4) the candidates' race was not considered in scoring their interviews.

9

In his opposition, Ware argued he was denied a promotion because of race, not his qualifications, asserting: (1) He had a long, positive track record at the Airport as an SSO III, including multiple temporary assignments to serve as an acting SSO IV, but he had been repeatedly passed over for promotion in favor of less qualified non-Black candidates; (2) there was widespread systematic anti-Black bias in the promotion process and Airport and LBPD cultures; (3) the evidence that the interviewers changed their scores created a rational inference there was collective decisionmaking in the promotion process; (4) the candidates' qualifications and resumes were not evaluated with objective criteria, leading to an inference that the 2020 scoring procedure was implemented to facilitate discrimination; and (5) expert statistical analysis from Dr. D.C. Sharp, a Managing Director at Econ One Research, Inc., regarding the SSO IV promotions at the Airport from 2012 to 2020 showed the promotion process was not racially neutral.

Examining the period from 2012 to 2020 using publicly available census data, Dr. Sharp calculated a "Black Candidate Availability" of 40.79% reflecting the percentage of Black officers out of all non-sworn protective service officers who live in the City of Long Beach. Dr. Sharp determined in light of this level of Black candidate availability that if promotions to SSO IV were race-neutral, he would expect there to have been 2.45 promotions of Black officers, out of six total promotions to SSO IV positions in the 2012 to 2020 time period. Therefore, because there were six total SSO IV promotions, with no promotions of Black candidates, "there were approximately . . . 2 [rounded down from 2.45] fewer [B]lack promotions to SSO IV than we would have expected if promotions were neutral with respect to race."

Dr. Sharp further found "the probability that this shortfall could have occurred by chance alone is less than 5%." Dr. Sharp also analyzed the number of SSO's at the Airport in 2017 and found only three out of 22 were Black, while based on the level of Black candidate availability he would have expected to find approximately nine Black SSO's. Dr. Sharp declared, "The probability that this shortfall could have occurred by chance alone is less than 5%. In fact, at 2.59 standard deviations, the probability that this shortfall could have occurred by chance alone is approximately 1%."

In support of his argument the City had an anti-Black culture and bias, Ware submitted "me too" declarations from three Black City employees who served as SSO's at the Airport: Tanaya Gaines, Arkeishanae Pink, and Dainell Woodbey, two of whom had been denied promotions at the Airport. Gaines worked at the Airport as an SSO II/Dispatcher from 2006 to 2011, when she resigned. She knew Ware and commended his performance as an SSO III at the Airport. She described the work environment in the City as "segregated" with "a lot of nepotism" and "favoritism."

Pink was a current employee who began working for the City in 2009. In 2010 she became an SSO II and was transferred to the Airport, where she worked in various positions over the next 10 years. Pink declared she was passed over for promotion due to her race, partly due to the intervention of her White supervisor, Brandon Kraus, who was the former acting manager for safety and security; Pink lodged a discrimination claim against him. Pink believed Ware was an excellent employee but was passed over for promotion because of his race.

11

Woodbey, another current employee, had worked for the City as an SSO since 2005 and was transferred to the Airport along with Ware. According to Woodbey, no other Black officers had been hired since 2005. Woodbey stated he experienced discriminatory disciplinary proceedings orchestrated by the Airport chief of security, John Blood. In addition, in approximately 2013 a White LBPD sergeant who worked at the Airport approached him at lunchtime. Woodbey was eating a salad, and the sergeant asked if he was eating fried chicken. Woodbey stated he and Ware had applied for the SSO IV position in 2012 or 2013 (when Woodbey was also an SSO III), but they were passed over for promotion because of their race.[8] The City did not dispute that Woodbey experienced racial stereotyping on the job.

Ware argued that collectively the evidence supported a rational inference of intentional discrimination on the basis of his race. Ware also requested the trial court grant a continuance under section 437c, subdivision (h), to permit resolution of Ware's pending motion to compel the City to produce additional information to assist Dr. Sharp with his statistical analysis.

In its reply, the City argued Ware's evidence of prior instances of racial hostility or discriminatory promotion practices was not relevant because in 2019 the Airport ceded authority over the selection process for SSO IV's to the LBPD. With regard

---

[8] In its response to Ware's separate statement, the City disputed that Woodbey was passed over for a promotion in 2012 or 2013. According to the City's records, a candidate with the initials D.W. cancelled his interview two hours before the scheduled time. For purposes of the motion, we consider this fact disputed.

to inconsistencies in the 2020 candidate ranking process, the City argued there was no affirmative evidence of any racial hostility or discrimination. The City did not present a declaration from its own expert but argued the analysis from Dr. Sharp had no evidentiary value because the sample size was too small and Dr. Sharp principally considered the time period prior to when the LBPD formally took over the SSO IV selection process. For the same reason, the information sought in Ware's request for a continuance was irrelevant, because Dr. Sharp's analysis was inherently unreliable. Finally, the City argued that, even if credible, Ware's "me too" declarants were not similarly situated to Ware, and therefore, the declarations did not create a triable issue of fact.

E.    *The Trial Court's Ruling*

After a hearing, on February 22, 2022 the trial court granted summary judgment for the City, finding the City had provided legitimate reasons for promoting other candidates over Ware in 2020, and Ware failed to rebut this evidence by raising a triable issue of fact as to the City's allegedly discriminatory intent. The second cause of action for failure to prevent discrimination necessarily failed because it depended on the underlying discrimination claim. The court also denied Ware's request for a continuance, finding Ware failed to show how further discovery of statistical evidence would address the small sample size, which rendered Dr. Sharp's analysis defective and insufficient to create a triable issue of fact. The court did not reach whether Ware failed to exhaust administrative remedies for the second cause of action.

13

In its final ruling, the trial court sustained six of the City's objections to Ware's evidence, five of which pertained to the statements in Ware's declaration that he believed his race was a motivating factor in the City's decision not to promote him.  The sixth objection involved a statement by Gaines that the failure to promote Ware was an example of ongoing discrimination at the LBPD.  The court overruled the parties' remaining objections, including the City's objections to the "me too" declarations.[9]

On March 14, 2022 the trial court entered judgment for the City.  Ware timely appealed.

## DISCUSSION

A.    *Standard of Review on Summary Judgment*

Summary judgment is appropriate only if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618; *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 668.)  "'""We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained."'  [Citation.]  We liberally construe the

---

[9]    Neither party on appeal challenges the trial court's evidentiary rulings, thereby forfeiting any challenge to the correctness of the rulings.  (*Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1197; *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114.)

14

evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.""" (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; accord, *Doe*, at p. 669; *Sabetian v. Exxon Mobil Corporation* (2020) 57 Cal.App.5th 1054, 1068.)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; *Sabetian v. Exxon Mobil Corporation, supra,* 57 Cal.App.5th at p. 1068.) If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850; *Sabetian*, at p. 1069.) "The plaintiff . . . shall not rely upon the allegations or denials of its pleadings to show . . . a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists." (Code Civ. Proc., § 437c, subd. (p)(2); accord, *Roman v. BRE Properties, Inc.* (2015) 237 Cal.App.4th 1040, 1054 ["It is fundamental that to defeat summary judgment a plaintiff must show 'specific facts' and cannot rely on allegations of the complaint."]; *Regional Steel Corp. v. Liberty Surplus Ins. Corp.* (2014) 226 Cal.App.4th 1377, 1388.)

FEHA prohibits an employer from subjecting an employee to an adverse employment action based on the employee's protected status. (§ 12940, subd. (a).) In evaluating claims of discrimination under FEHA, California courts apply the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*

15

(1973) 411 U.S. 792.  (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 214 (*Harris*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)

Under this approach, if the plaintiff establishes a prima facie case supporting his or her discrimination claim, the burden shifts to the employer to rebut the presumption of discrimination by offering a legitimate, nondiscriminatory reason for the adverse employment action.  (*Harris, supra*, 56 Cal.4th at p. 214; *Guz, supra*, 24 Cal.4th at pp. 355-356.)  An employer may meet its initial burden in moving for summary judgment or adjudication of an employment discrimination cause of action by presenting evidence that one or more elements of a prima facie case are lacking, or the employer acted for a legitimate, nondiscriminatory reason.  (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 32 (*Zamora*); *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1181; *Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 591.)  A legitimate, nondiscriminatory reason is one that is unrelated to the prohibited bias and, if true, would preclude a finding of discrimination.  (*Guz*, at p. 358.)  "[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct.  [Citations.]  While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*."  (*Ibid*.)

If the employer satisfies its initial burden, the burden shifts to the plaintiff to present evidence creating a triable issue of fact showing the employer's stated reason was a pretext for unlawful animus in order to avoid summary judgment or adjudication.  (*Zamora, supra*, 71 Cal.App.5th at p. 32; *Husman*

16

*v. Toyota Motor Credit Corp., supra*, 12 Cal.App.5th at p. 1182; *Soria v. Univision Radio Los Angeles, Inc., supra*, 5 Cal.App.5th at p. 591.) In other words, the plaintiff has "the burden to *rebut* [the employer's] facially dispositive showing by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred." (*Guz, supra*, 24 Cal.4th at p. 357.)

To meet this burden, the plaintiff may present evidence showing the stated reason by the employer was "unworthy of credence" as circumstantial evidence of pretext. (*Guz, supra*, 24 Cal.4th at p. 361; see *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 147 (*Reeves*) ["In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."];[10] *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 863 [""the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence'

---

[10] California courts often look to federal decisions interpreting federal antidiscrimination laws in interpreting FEHA. (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 812 [""Because the antidiscrimination objectives and relevant wording of title VII of the Civil Rights Act of 1964 (Title VII) [(42 U.S.C. § 2000e et seq.)] [and other federal antidiscrimination statutes] are similar to those of the FEHA, California courts often look to federal decisions interpreting these statutes for assistance in interpreting the FEHA.""]; *Estrada v. City of Los Angeles* (2013) 218 Cal.App.4th 143, 150 [same].)

[citation], and hence infer 'that the employer did not act for the [the asserted] non-discriminatory reasons.""""].)

To defeat a motion for summary judgment, therefore, a plaintiff must present evidence to support a rational inference that intentional discrimination, "on grounds prohibited by the statute, was the true cause of the employer's actions." (*Guz, supra,* 24 Cal.4th at p. 361, italics omitted; see *Harris, supra,* 56 Cal.4th at pp. 229-232 [FEHA does not require proof that discriminatory animus was a '"but for"' cause of an adverse action, only that it was a "*substantial* motivating factor"].)

B.     *Ware Raised a Triable Issue of Fact as to His FEHA Race Discrimination Claim*

To establish a prima facie discrimination claim, Ware needed to show "(1) he was a member of a protected class, (2) he was qualified for the position he sought . . . , (3) he suffered an adverse employment action, such as . . . denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra,* 24 Cal.4th at p. 355.)  The City does not dispute that Ware established a prima facie case of race discrimination.  Ware showed:  (1) he was Black; (2) he was qualified for promotion in 2020 to the SSO-IV position; (3) he was passed over for promotion; and (4) his qualifications and repeated service as acting SSO IV at the Airport suggested he was passed over for discriminatory reasons.

The City argued it presented legitimate, nondiscriminatory reasons for its failure to promote Ware, including that the two selected candidates were better qualified than Ware; the panelists used the same neutral criteria in making the decision; and the panelists all felt Ware needed more "development" and

18

did not provide sufficiently detailed responses to the interview questions. However, Ware presented evidence in response that raised a triable issue of fact as to whether the City's asserted reasons for failing to promote Ware were legitimate, and Ware presented sufficient evidence that supported a rational inference the true reason was discrimination based on his race.

As discussed, an employee may raise a triable issue of fact to avoid summary judgment by showing the employer's proffered nondiscriminatory reasons were unworthy of credence. (*Reeves, supra*, 530 U.S. at p. 148 ["a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"]; *Furnco Constr. Corp. v. Waters* (1978) 438 U.S. 567, 577 ["[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration"]; *Zamora, supra*, 71 Cal.App.5th at p. 34 ["""[T]he plaintiff may establish pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."""]; *Ewing v. Gill Industries, Inc.* (1992) 3 Cal.App.4th 601, 614 [an employee may succeed in opposing summary judgment "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence"].)

As the *Guz* court explained in the context of an employee challenging the employer's proffered reasons for terminating him

in light of a reduction in force, "in an appropriate case, an inference of dissembling may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions." (*Guz*, *supra*, 24 Cal.4th at p. 363; see *Reeves*, *supra*, 530 U.S. at pp. 147-149 ["Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."].)

Here, Ware presented evidence creating a triable issue of fact whether the City's proffered reasons for not promoting him were worthy of credence, coupled with some circumstantial evidence of pretext—that the real reason for not promoting him was that he was Black. Although we agree with the trial court that Ware's evidence of discriminatory intent was weak, "[l]ike most claims of race discrimination, the inquiry here involves contested facts from which competing inferences could be drawn. These kinds of claims are rarely suited for summary adjudication." (*Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640, 673.)

      1.    *Ware presented evidence that created a triable issue of fact as to whether the City's proffered nondiscriminatory reasons were legitimate*

On appeal, the City relies, as it did in the trial court, on four asserted nondiscriminatory reasons for its 2020 promotion decisions: (1) the panelists independently assessed the qualifications of each candidate using the same neutral questionnaire; (2) the panelists all felt Ware needed more development and did not provide sufficiently detailed answers to the interview questions; (3) the two highest-scoring candidates

20

demonstrated they were better qualified for promotion than Ware; and (4) the candidates' race was not considered in scoring their interviews. Ware created a triable issue of fact as to each of these justifications.

> a. *Ware cast doubt on whether the members of the review panel acted independently in the promotion process, which was entirely subjective*

Ware presented evidence that raised a material question of fact whether the three 2020 interview panelists (Watson, Martinez, and McVay) acted independently in scoring the candidates. The panelists stated verbatim in their declarations in support of the City's summary judgment motion: "I scored each candidate independently. Each candidate's score was purely my own assessment, based on how I felt each candidate performed in their interview." However, Watson admitted "there would be times that . . . if we had a question about a certain candidate, [there] might be a discussion . . . [about] what score we were thinking about giving." He added that some of the scores "were done independently and some were done with consensus." Similarly, Martinez recalled that "at one point there may have been a tie on scores, and . . . some discussion on what to do about the tie." Further, Martinez recorded his scores in pencil "so that if I wanted to revise it at the end, after kind of getting, you know, a totality of the interview and thinking about it, . . . if I decided to change my score, . . . it wasn't going to look all, you know, unprofessional." And McVay admitted he relayed to the other panelists his negative personal experiences with one of the candidates who he believed did a poor job as an SSO III, although

21

McVay did not know whether this affected the panelists' scoring of the candidate.

We recognize that showing an evaluation process is subjective does not by itself show intentional discrimination.[11] (See *Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1005 ["[A]bsent some evidence that the [employer] made its decisions based upon race, the mere use of subjective criteria does not permit us to second guess the employer's business judgment."]; *Los Angeles County Dept. of Parks & Recreation v. Civil Service Com.* (1992) 8 Cal.App.4th 273, 281 ["The fact that promotion decisions are traditionally left to the wide and subjective discretion of supervisors who are familiar with the employee applicants does not by itself raise an inference of discriminatory conduct."]; *Coleman v. Quaker Oats Co.* (9th Cir. 2000) 232 F.3d 1271, 1285 ["While a subjective evaluation system can be used as cover for illegal discrimination, subjective evaluations are not unlawful per se and 'their relevance to proof of a discriminatory intent is weak.'"].)

However, courts have long recognized that "subjective evaluations may lend themselves to discriminatory abuse and should, therefore, be closely scrutinized." (*Hicks v. KNTV*

---

[11]     We are not aware of any published cases in which a California appellate court has found a failure to guard against implicit bias may itself be actionable under FEHA. (See generally *People v. McWilliams* (2023) 14 Cal.5th 429, 451 (conc. opn. of Liu, J.) [observing in context of officer's parole search, "Research confirms what is no surprise as a matter of common sense:  On-the-spot discretionary decisions are vulnerable to implicit bias because they are neither constrained by a clear rubric of relevant criteria nor preceded by extensive deliberation."].)

*Television, Inc., supra*, 160 Cal.App.4th 994, 1005; accord, *Jauregui v. City of Glendale* (9th Cir. 1988) 852 F.2d 1128, 1136 [in considering whether there was discriminatory intent, "'subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized.'"]; see *ibid*. [city's inconsistency in reasons for promoting only White male police officers as part of subjective promotion process created inference of unlawful discrimination].)

Here, subjective criteria were the *only* criteria used in the 2020 promotional decisions to score eligible candidates, making the City's process susceptible to discriminatory abuse. Candidates received no points for relevant experience or training aside from those the panelists awarded based on their assessment of the candidates' performance during the interviews. Notably, two of the three panelists wrote the same phrase on Ware's screening interview summary—"needs more development"—while the third wrote, "not strong—more development," suggesting some coordination as to the scoring. When coupled with Ware's evidence that the panelists changed some of their answers and at times discussed the scoring of individual candidates before making the final tallies, this evidence casts doubt on the credibility of the City's proffered explanation for its failure to promote Ware.

> b.     *Ware raised a question of fact whether Marino and Vigil were more qualified for promotion*

Ware also presented significant evidence that he was the most qualified candidate. Avila, the deputy chief of the LPBD support bureau, testified that, from a review limited to the resumes of Marino and Ware, Ware was the more qualified

23

candidate to fill the Airport SSO IV position. Stites, who was promoted to SSO IV in 2015, testified that a candidate who had worked at the Airport and served as an acting SSO IV, which Ware had done, would be more qualified than someone who did not have this experience. Further, according to Stites, "going by training and experience," Ware was more qualified than Marino for the 2020 Airport SSO IV promotion. Yet none of the panelists scored Ware higher than Marino on question 1, the only interview question directed at work experience and educational background. All three panelists rated Marino a "5" out of "5," but Ware was rated "4" out of "5" by two of the panelists (and "5" by the third).

Ware also disputed whether he truly needed "more development," as the panelists stated in their scoring sheets, in light of the fact that for more than a decade he had been working at the Airport as an SSO III and was repeatedly assigned to serve as acting SSO IV, while Marino had only spent approximately three years as an SSO III in the marine patrol detail. And, as Ware noted, despite the fact the duties of SSO IV included the "[a]bility to write clear, accurate, and legible reports," Marino did not include a cover letter with his one-page resume, while Ware provided both a cover letter and a detailed, two-page resume outlining his extensive experience.

2.    *Ware presented some evidence of racial animus*
The strongest evidence raising an inference of discrimination is discussed above, namely, that Ware was on paper the most qualified candidate, for over 10 years the City had consistently assigned him to carry out SSO IV duties, the interview panelists dissembled as to how they conducted the

24

scoring, and the scoring was in part done collectively as part of an entirely subjective process.  Moreover, "[b]ecause proof of discriminatory intent often depends on inferences rather than on direct evidence, very little evidence of such intent is necessary to defeat summary judgment."  (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 991; accord, *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 283.)

To bolster a rational inference of discriminatory intent, Ware also presented evidence that supported an inference the City harbored a culture of anti-Black animus.  Although this evidence was relatively weak, when combined with the evidence disputing the legitimacy of the City's proffered reasons, there was a triable issue of fact as to whether Ware was passed over for promotion because of his race.  (See *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 758 ["Although we have set out several matters which *by themselves* will not constitute substantial evidence that defendant's stated reason for firing plaintiff was pretextual or that defendant acted with a discriminatory animus when it fired her, there remains the question whether these matters, *when taken together*, do constitute sufficient evidence to demonstrate a triable issue of fact with respect to plaintiff's contention that her pregnancy was the true cause of defendant's decision to fire her. In our view, they do."].)

First, Ware provided Dr. Sharp's expert testimony that the lack of any promotions of Black candidates in the six SSO IV promotion decisions at the Airport from 2012 to 2020 was statistically significant.  The trial court discounted Dr. Sharp's analysis entirely, accepting the City's argument the sample size was too small and the promotion decisions prior to LBPD taking

25

control of the promotion process were irrelevant.  Although we agree the sample size of 22 total non-sworn protective service employees at the Airport was small, there is some probative value to the fact there were no promotions of Black candidates despite the fact three of the SSO's were Black and some (or at least Ware) were qualified for promotion.  (See *Guz, supra*, 24 Cal.4th at pp. 368-369 [observing Guz's evidence that his employer favored two younger employees was weakened by fact there were only six employees in the disbanded unit but not discounting that evidence completely]; *Obrey v. Johnson* (9th Cir. 2005) 400 F.3d 691, 697 [concluding district court abused its discretion in excluding study that compared race of 10 applicants for promotion to manager at shipyard to race of two who were selected "[s]ince the defendant's objections to the admission of [the study] went to weight and sufficiency rather than admissibility"].)

*Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1009 and *Aragon v. Republic Silver State Disposal* (9th Cir. 2002) 292 F.3d 654, 663, relied on by the City, are not to the contrary. The courts in those cases did not hold the statistical evidence was inadmissible to show intentional discrimination, only that the evidence did not alone meet the employees' burden to raise an inference of intentional discrimination.  As the Court of Appeal in *Foroudi* observed, the statistical evidence presented by the plaintiff, which failed to account for age-neutral factors, did not "eliminate nondiscriminatory reasons for any apparent disparities," and therefore, it was not sufficient to raise an inference of discrimination.  (*Foroudi*, at p. 1009; see *Aragon*, at p. 663 ["[T]he fact that three of the four [employees] singled out for lay off that night were white could constitute *circumstantial*

26

evidence of discrimination demonstrating pretext. [Citation.] Yet, because the sample size is so small, we decline to give it much weight."]; see also *Life Technologies Corp. v. Superior Court* (2011) 197 Cal.App.4th 640, 651 ["statistical evidence of a company's general hiring patterns, although relevant, carries *less probative weight* than it does in a disparate impact case"], italics added, disapproved of on other grounds by *Williams v. Superior Court* (2017) 3 Cal.5th 531.)[12]

Ware also provided evidence of his own experiences at the Airport, including the four prior times he was passed over for promotion, the instance in which a supervisor at the Airport sent him a racist comic strip,[13] and the 2011 or 2012 incidents in

[12] Other courts have considered statistical analysis to prove intentional discrimination in disparate treatment cases. (See *Rosenfeld v. Abraham Joshua Heschel Day School, Inc.* (2014) 226 Cal.App.4th 886, 896 ["[S]tatistical evidence may be utilized to show *either* disparate treatment or disparate impact discrimination."]; *Teamsters v. United States* (1977) 431 U.S. 324, 334-343 [upholding use of statistics to prove pattern of intentional discrimination in "purposefully" treating "Negroes and Spanish-surnamed Americans less favorably than white persons"]; *Avenue 6E Investments, LLC v. City of Yuma* (9th Cir. 2016) 818 F.3d 493, 507-508 ["The complaint's statistics on the disparate impact caused by the decision and the historical background of the decision also tend to make the disparate-treatment claims plausible."].)

[13] As Ware described in his declaration: "My experiences with workplace racism while working for the City started early in my career. In or about late 2008, around the election of President Barack Obama, as I was leaving the police academy grounds, I received a text from a senior officer at Long Beach Airport, Bradley Lemmon ('Lemmon'), containing a racist comic. In this

27

which a White LBPD sergeant talked to Ware about being a "'ghetto cop'" and, on another occasion, referred to Ware as "'very intimidating'" compared to a White officer.  With respect to the promotions, each time he was interviewed by a majority- or all-White panel (with no Black panelists).  And in all but one instance the selected SSO had less experience or seniority than Ware (Raedle in 2012; Willieford in 2014; and Khiev in 2014).  The City sought to minimize this evidence, pointing to the fact the earlier promotions occurred prior to the integration under which LBPD took over the promotion process for SSO IV's at the Airport, and the racist comments were not made by one of the three decisionmakers in 2020 or otherwise related to the 2020 promotion decision.  We agree some of the examples were distant in time, lessening their weight, but they still have some probative value.  Moreover, as to the transfer of the promotion process to the LBPD, it is uncontroverted that LBPD officers participated in the earlier promotions.

Finally, Ware presented three "me too" declarations from three Black employees at the Airport.  While none of the declarants described an instance of racism perpetrated by any of the 2020 interview panelists, all three described examples of

---

comic, a black individual ascended to heaven.  At the gates of heaven, he is told by God that he will receive his wings.  When the black individual asks God if that makes him an angel, he is told 'no, nigga: it makes you a bat.'  This text was unprovoked.  I believe it was in response to confirmation that Obama had been elected as President of the United States.  As Long Beach Airport sponsored my attendance at the police academy, I was on the clock when I received this text.  It was a sign of the racism I would endure working for the City in years to come."

what they perceived was racial animus by supervisors at the Airport and a culture of anti-Black bias.

For example, Pink declared she was passed over for promotion to a higher SSO rank based on her race, partly due to the intervention of Kraus, her White supervisor, who was the former acting manager for safety and security, resulting in her lodging a discrimination complaint against him. And Woodbey declared he applied for the SSO IV position in 2012 or 2013 (at the same time Ware did), but he and Ware were both denied a promotion. Further, the City had not hired any Black SSO's since 2005. Woodbey also described an incident in 2013 in which a White LBPD sergeant who worked at the Airport approached Woodbey at lunch while he was eating a salad and asked if he was eating fried chicken.

These declarations may have been insufficient without more to create a triable issue, especially given the lack of a direct connection to the three decisionmakers in 2020 or the 2020 decisionmaking process. Nonetheless, in conjunction with Ware's other evidence, they suggest a culture of racial animus and strengthen a rational inference of discrimination in the promotion process. (See *Meeks v. AutoZone, Inc.* (2018) 24 Cal.App.5th 855, 871 ["'Me-too' evidence is therefore not subject to any per se rule of exclusion, and may be admissible to prove a defendant's motive or intent even where the conduct occurred outside the plaintiff's presence and at times other than when the plaintiff was employed."]; *Johnson v. United Cerebral Palsy/Spastic Children's Foundation, supra*, 173 Cal.App.4th at p. 767 ["Dissimilarities between the facts related in the other employees' declarations and the facts asserted by plaintiff with regard to her own case go to the weight of the evidence, not its

29

admissibility."]; *Nadaf-Rahrov v. Neiman Marcus Group, Inc., supra*, 166 Cal.App.4th at p. 992 ["Assuming for purposes of argument that Neiman Marcus has satisfied its burden to produce evidence of a legitimate nondiscriminatory reason for Nadaf-Rahrov's termination, Nadaf-Rahrov successfully rebutted that showing with evidence of Neiman Marcus's discriminatory treatment of other Middle Eastern employees at Neiman Marcus. . . . Admittedly, the link between these employees' experiences and Nadaf-Rahrov's termination is tenuous, but very little evidence of discriminatory intent is necessary to defeat summary judgment."]; *Pineda v. Abbott Laboratories Inc.* (9th Cir. 2020) 831 Fed.Appx. 238, 243 ["'[M]e too' evidence—here, declarations by other employees, including two supervisors, alleging adverse employment actions against other employees for discriminatory reasons—may 'constitute substantial evidence requiring reversal of [summary] judgment.'"].)

The City relies on *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 297 and *Sallis v. Univ. of Minn.* (8th Cir. 2005) 408 F.3d 470, 478 to support its argument that Ware's "me too" declarations recounted anecdotes that were too attenuated to have any probative value.[14]  However, as to statements made by

---

[14]    *McCoy* and *Sallis* are not quite on point.  In *McCoy*, the Court of Appeal concluded the trial court acted within its discretion in excluding at trial "me too" evidence of harassment or discrimination against other employees as not relevant to the plaintiff's retaliation claim.  (*McCoy v. Pacific Maritime Assn., supra*, 216 Cal.App.4th at pp. 296-297.)  However, the court directed the trial court on remand to consider whether evidence of retaliation against other employees presented "factual scenarios involving other employees that are 'sufficiently similar'"

30

supervisors (for example, the fried chicken comment), the Supreme Court has rejected a strict application of the "stray remarks" doctrine, which federal courts have relied on to discount potentially damaging discriminatory remarks made by non-decisionmakers. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 540-541.) As the Supreme Court in *Reid* explained, a discriminatory "remark not made directly in the context of an employment decision or uttered by a non-decision-maker may be relevant, circumstantial evidence of discrimination." (*Id.* at p. 539.) *Reid* continued, "*Reeves* indicates that even if [discriminatory] comments can be considered stray remarks because they were not made in the direct context of the decisional process, a court should not categorically discount the evidence if relevant; it should be left to the fact finder to assess its probative value." (*Id.* at pp. 539-540, citing *Reeves, supra,* 530 U.S. at pp. 153-154; see *Reid,* at p. 541 ["Determining the weight of discriminatory or ambiguous remarks is a role reserved for the jury."].) Here too, although the "me too" evidence of remarks and discriminatory conduct by supervisors not involved in the 2020

to those presented by appellant in her retaliation claim." (*Id.* at p. 298.) As discussed, on appeal the City does not argue the "me too" evidence was inadmissible, instead asserting the evidence did not provide substantial evidence of discriminatory animus. In *Sallis*, the Eighth Circuit held the district court did not abuse its discretion in limiting discovery relevant to the University of Minnesota's summary judgment motion to discrimination against other employees in the department at the university where the employee had worked for the prior 10 years. (*Sallis v. Univ. of Minn., supra,* 408 F.3d at pp. 477-478.) Here, Ware submitted "me too" evidence from the relatively narrow population of Airport SSO's.

31

decisionmaking process provides weaker evidence of discriminatory intent with respect to the 2020 promotion decision, the evidence has some probative value in considering whether there is a rational inference the failure to promote Ware was based on his race.

In light of the evidence submitted by Ware raising a triable issue of fact with respect to the legitimacy of the City's proffered reasons for not promoting Ware, combined with the weaker evidence of discriminatory animus, the trial court erred in granting summary judgment.[15]

---

[15] The City does not contend on appeal that even if we conclude the trial court erred in finding there was no triable issue of fact as to Ware's underlying FEHA claim, we should still affirm the grant of summary adjudication as to Ware's second cause of action for failure to prevent discrimination and retaliation because Ware failed to exhaust his administrative remedies. In the absence of any argument by the City on appeal as to the exhaustion ground for summary adjudication, we reverse as to both counts. We therefore do not reach whether the trial court abused its discretion in denying Ware's request for a continuance under section 473c, subdivision (h).

## DISPOSITION

The judgment is reversed.  The trial court is ordered to vacate its order granting the City's motion for summary judgment or in the alternative summary adjudication of both causes of action and to enter a new order denying the City's motion.  Ware is entitled to recover his costs on appeal.


                                        FEUER, J.

We concur:


          PERLUSS, P. J.


          SEGAL, J.